Zalmai Sayyad AMEERIAR and Ayesha Zalmai Ameeriar, Petitioners,

v.

IMMIGRATION AND NATURALIZA-TION SERVICE, Respondent.

No. 18038.

United States Court of Appeals, Third Circuit.

Argued April 21, 1970.

Reargued Nov. 24, 1970.

Decided Feb. 16, 1971.

Rehearing Denied March 22, 1971.

1. See NLRB v. Amalgamated Clothing Workers of America, 5 Cir. 1970, 430 F.2d 966.

Gibbons, Circuit Judge, dissented and filed opinion in which Hastie, Chief Judge, and Aldisert, Circuit Judge joined.

Freedman, Circuit Judge, dissented and filed opinion in which Aldisert, Circuit Judge, joined.

James J. Orlow, Orlow & Orlow, Philadelphia, Pa., for petitioners.

Merna B. Marshall, Asst. U. S. Atty., Philadelphia, Pa., for respondent.

Before GANEY, VAN DUSEN and GIBBONS, Circuit Judges.

Reargued before HASTIE, Chief Judge, and GANEY, FREEDMAN, SEITZ, VAN DUSEN, ALDISERT, ADAMS, GIBBONS, and ROSENN, Circuit Judges.

## OPINION OF THE COURT

GANEY, Circuit Judge:

The sole problem posed for disposition by this court is whether there was a proper exercise of discretion by the designees of the Attorney General, the Special Inquiry Officer and the Board of Immigration Appeals in denying adjustment of status to the petitioners under § 245 of the Immigration and Nationality Act, 8 U.S.C. § 1255(a), (1964). Review is here sought under § 242(b) of that Act, 8 U.S.C. § 1252(b), (1964).

The narrow problem posed here results from the fact that the petitioners have conceded their deportability, but have requested that they be given the discretionary relief of adjustment of status, 8 U.S.C. § 1255(a), (1964), or voluntary departure in lieu of deportation, 8 U.S.C. § 1254(e), (1964). Additionally, the Government has conceded that petitioners have met the statute requisite for eligibility of adjustment of status, 8 U.S.C. § 1255(a), (1964). The guiding principle for the exercise of such discretion is set forth in Santos v. Immigration and Naturalization Service, 375 F.2d 262, 264 (C.A.9, 1967), wherein the court, in considering the proper exercise of discretion, stated: "An 'evaluation of all the facts' requires due consideration be given to the presence or

absence of special equities. See Matter of Oritz-Prieto, B.I.A.Int.Dec. #1508, July 16, 1965; Matter of V——, 7 I. & N. Dec. 348 (1956). Indeed, such a requirement is implicit in the high burden of proof placed on the applicant by the Board. 'The extraordinary discretionary relief provided in Section 245 of the Act can only be granted in *meritorious* cases; the *burden* is always upon the alien to establish that his application for such relief *merits favorable consideration.*' Matter of Oriz-Prieto, supra, (emphasis added); Matter of A——, 9 I. & N.Dec. 249 (1961); Mater of G——, 9 I. & N.Dec. 38 (1960). See also 8 C. F.R. § 242.17(d)."[1] Cf. Fook Hong Mak v. Immigration and Naturalization Service, 435 F.2d 728 (2nd Cir., Opinion of 11/24/70).

■ Section 245 of the Immigration and Naturalization Act [2] requires the alien to fulfill two requirements, (1) the statutory requirements of inspection and admission, application, eligibility for an immigrant visa and immediate availability of the visa, and (2) he must convince the Attorney General to exercise favorable discretion in his case. Lihati Lui Unga v. Immigration and Naturalization Service, 404 F.2d 48, 49 (C.A.9, 1968); Chen v. Foley, 385 F.2d 929, 935 (C.A. 6, 1967). Adjustment of status is therefore a matter of administrative grace, not mere statutory eligibility.[3]

Based on the "unequivocal" finding that petitioners had entered the United States with the intention to seek employment and adjustment of status immediately, the Special Inquiry Officer declined to exercise his discretion to grant them adjustment of status, holding, "It may seem to some persons to be rather harsh to require these people to depart from the United States merely for the purpose of obtaining immigrant visas with which to return for permanent residence. I cannot, however, in good conscience, grant their request for adjustment of status under Section 245 * * * because the adjustment of status provided for in that section of law is an extraordinary means of giving persons lawful permanent residence status where their cases have great merit. The cases of these two respondents do not have such great merit and, in addition, I am satisfied that they have attempted to impose upon the Government of the United States by coming here as nonimmigrants with the intention of adjusting their status to that of lawful permanent resident aliens as soon after they arrived in the United States as they believed possible."

The Board of Immigration Appeals dismissed petitioners' appeals, finding that the Special Inquiry Officer had properly exercised his discretion.

The pertinent facts upon which the Special Inquiry Officer's judgment was

---

1. 8 C.F.R. § 242.17(d) (application for adjustment of status in deportation proceedings) provides: "The respondent [applicant for adjustment] shall have the burden of establishing that he is eligible for any requested benefit or privilege and that it should be granted in the exercise of discretion."

2. This section provides: "The status of an alien, other than an alien crewman, who was inspected and admitted or paroled into the United States may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admis-

sible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is approved."

3. See United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 266–267, 74 S.Ct. 499, 503, 98 L.Ed. 681 (1954): "[I]f the word 'discretion' means anything in a statutory or administrative grant of power, it means that the recipient must exercise his authority according to his own understanding and conscience." (Emphasis added.) Cf. Foti v. Immigration and Naturalization Service, 375 U.S. 217, 228–229, n. 15, 84 S.Ct. 306, 11 L.Ed.2d 281 (1963); United States ex rel. Hintopoulos v. Shaughnessy, 353 U.S. 72, 77, 77 S.Ct. 618, 1 L.Ed.2d 652 (1957).

affirmed by the Board of Immigration Appeals are as follows: Zalmai Sayyad Ameeriar came to this country from Kabul, Afghanistan, where he had been a cashier in the employ of the United Nations for a period of five years, and it may readily be assumed from the nature of his position that he was entirely familiar with English and governmental authorities. Accordingly, in 1967, he first sought and obtained a visa entitling him to come to this country as a student, and when discussing the nature of his visa with his superior, he was told it was a mistake and he should apply for a visitor's pleasure visa, which he obtained in 1968, from the Deputy Representative of the United Nations, calling for a pleasure trip as a tourist in the United States, "on a personal matter," and he forwarded this to the Consul of the United States.[4] He was admitted to this country as a nonimmigrant under § 101(a) (15) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a) (15) (B) (1964). This would show his knowledge of the limited duration of his visa. He was married to his wife for seventeen years and sired six children, three of whom he placed with his father and three with their mother. After separating from his wife, he secured a divorce from her and married his present wife. Five months after his marriage, he applied for the visa aforesaid, left Afghanistan and arrived in New York on February 10, 1968. On February 15, 1968, he located in the small village of Butztown, Pennsylvania, on the outskirts of the city of Bethlehem, hard by the sprawling plant of the Bethlehem Steel Company which stretches along the Lehigh River for some five miles, and secured a job as an accountant with a steel contracting firm, all this within five days of his arrival in New York. On February 14th, four days after his arrival here, as shown by evidence offered by the Government, he resigned his position as a cashier with the United Nations in Kabul, Afghanistan, and never renewed his application for a visitor's pleasure visa, but explained the same by saying that at the time he made application with the Labor Department for a job, he was told by a lady clerk, "You are in under a visitor's visa because now your visa is changed to other immigration visa. If you work or don't work, that is up to you." He testified this conversation persuaded him that it was unnecessary to renew his visitor's pleasure visa and he thought he was not overstaying his permitted time, which was to expire on March 15, 1968. He testified that it was his intention to come to the United States and remain here if he liked it, that he wanted to stay in this country and his wife, likewise, repeated the same statement.

At the time of his departure from Afghanistan and his arrival in New York, his present wife was five months pregnant and she testified that if they were compelled to return to Afghanistan, food conditions were not conducive to the proper rearing of her infant child and a change in climate and food would be bad for the child.

The reality of the situation must be taken into consideration as it obtains on this record in which a total stranger to a foreign land, having no relatives here at all, comes immediately on a visitor's pleasure visa to a large industrial center, secures a house in a small village thousands of miles from his home and immediately seeks employment, all within five days.

4. Every alien is presumed to be an immigrant "until he establishes to the satisfaction of the consular officer, at the time of application for a visa, and the immigration officers, at the time of application for admission, that he is entitled to a nonimmigrant status under section 1101(a) (15) of this title." 8 U.S.C. § 1184(b). 8 U.S.C. § 1101(a) (15) provides: "The term 'immigrant' means every alien except * * * [(A) (iii) (B)] an alien * * * having a residence in a foreign country *which he has no intention of abandoning* and who is visiting the United States * * * *temporarily* for pleasure." (Emphasis added.)

**1032**

■ While we are in agreement that the law should lend itself to the amelioration of hardship cases and especially since previously the Government permitted individuals to arrange for what was termed "pre-examination" cases in which they went to Canada and returned to the United States and thereby acquired permanent residence status, nevertheless, adjustment of status should be granted only in meritorious cases.

Petitioners argue that amendments made to Section 245 in 1958 and 1960 demonstrate a Congressional intent to prohibit the Attorney General from denying adjustment of status where the result would be, as in this case, the return of the alien to his home country to apply for and receive an immigrant visa immediately available to him there. However, our examination of the legislative history indicates that the deletion of certain eligibility requirements from Section 245 as originally enacted was intended to increase, not decrease, the scope of the Attorney General's discretion. In the joint report accompanying the 1958 amendments, it was stated: "The purpose of the bill is (1) to revise section 245 * * * in such a manner as *to broaden the discretionary authority* of the Attorney General to adjust the status of certain aliens * * * *in worthy cases* * * *.*" Sen.Rep.No. 2133, H.R.Rep.No. 2258, 85th Cong., 2d Sess. (1958), 1958 U.S. Code Cong. & Admin.News, p. 3698. (Emphasis added). In 1960, the amendments broadened the class of aliens that the Attorney General could consider still further, "thereby providing considerably more flexibility in the administration of the law." Sen.Rep.No. 1651, 86th Cong., 2d Sess. (1960), 1960 U.S.Code Cong. & Admin.News, p. 3147.

■ Petitioners also argue that Congress removed from the consideration of the Attorney General whether an applicant for adjustment entered the United States with a pre-fixed intent to remain, by deleting in 1960 the eligibility requirement that an applicant be a "bona fide nonimmigrant." The 1960 Committee Report makes clear that such was not the case. "It is intended that only those aliens who enter the United States *in good faith* and without any intention of circumventing quota restrictions * * * shall be entitled to the benefits of section 245(a), as amended." Sen. Rep.No. 1651, *supra*, 1960 U.S.Code Cong. & Admin.News, p. 3147, (emphasis added)."[5]

5. This sentence appears at the end of a three-paragraph portion of the Report (pp. 3146, 3147 of 1960 U.S.Code Cong. & Admin.News), reading as follows:

"Section 10 of the joint resolution, as amended, would amend section 245 (a) of the Immigration and Nationality Act which authorizes the Attorney General under certain circumstances to adjust the status of an alien who was admitted into the United States as a bona fide nonimmigrant to that of an alien lawfully admitted for permanent residence. Under the proposed amendment to section 245(a) the procedure for the adjustment of the immigration status of aliens to that of aliens lawfully admitted for permanent residence would be broadened so as to include all aliens (other than alien crewmen) who have been inspected and admitted or who have been paroled into the United States, *thereby providing considerably more flexibility in the administration of the law.*

"The committee is aware that under the visa regulations of the Department of State that an alien who is registered on a quota waiting list as an intending immigrant will be issued a visitor's visa if he shows that he has to enter the United States temporarily to attend a business conference, to undergo medical treatment not otherwise available, or to attend to other urgent personal business. In order to prevent abuse by mala fide nonimmigrants, existing visa regulations require that the name of such an alien be taken off the quota waiting list if he willfully violates his nonimmigrant status while in the United States (22 CFR 42.22(a) (2)). For example, an alien's name will be removed from the quota waiting list if he was issued a visitor visa to attend a business conference, but while in the United States accepted local employment or overstayed the period of time of his admission.

When we consider all the factors here involved, the totality of the circumstances under which he left Kabul, Afghanistan, the securing of a visitor's pleasure visa; his being only five days in this country and applying for a permanent job which he secured; his resignation from his job in Afghanistan as cashier for the United Nations after four days here, all point unerringly, in our judgment, to the fact that he had a preconceived intention in Kabul, Afghanistan, of bypassing normal consular procedures for obtaining permanent residence.[6] We see no meritorious claim advanced by counsel, nor indeed does the record disclose any, and in our opinion the record justifies a finding that there was a deception on the appellants' part of the Immigration authorities. If this Court lends its imprimatur to this conduct, as shown by this record, it would work an attrition and indeed a rapid erosion of the authority invested in the Attorney General by Section 245 to exercise his discretion in the granting or denying of petitioners' adjustment of status.

> "It is not intended that the enactment of this proposed legislation would have the effect of repealing the visa regulations in this regard. It is intended that only those aliens who enter the United States in good faith and without any intention of circumventing quota restrictions of the Immigration and Nationality Act, or any other law relating to immigration shall be entitled to the benefits of section 245(a), as amended."

6. It should be remembered that any alien who applies for a nonimmigrant visa must, as required by statute, see note 4, *supra*, demonstrate to the satisfaction of the American consul in his home country and to the immigration officials upon his arrival in the United States that he fully intends to return to his home country. Therefore, absent an administrative error, any alien who arrives in the United States with the fixed intention to remain permanently has misrepresented his intention to the immigration authorities. An applicant who has thus misled immigration officials in an attempt to circumvent established procedures presents a weak case for the favorable exercise of the Attorney General's

We have carefully considered the Board's decision in Matter of Arai (Interim Decision No. 2027, filed March 4, 1970) and have concluded that it is inapplicable to the facts presented by this record.[7] See Thomaidis v. Immigration and Naturalization Service, 431 F.2d 711, 712 (C.A.9, 1970).

The judgment of the Board of Immigration Appeals will be affirmed and adjustment of status to the petitioners denied.

GIBBONS, Circuit Judge (dissenting).

This case is before us on a petition filed pursuant to 8 U.S.C. § 1105a (1964) for review of an order of the Board of Immigration Appeals. The petitioners seek review of a decision of the Board, affirming an order of a special inquiry officer in a proceeding under § 242(b) of the Immigration and Nationality Act, 8 U.S.C. § 1252(b) (1964), denying to petitioners adjustment of status authorized by § 245 of that Act, 8 U.S.C. § 1255(a) (1964).

discretion. There are many cases where the Attorney General has refused to exercise favorable discretion in adjustment proceedings, based on his finding that the nonimmigrant alien had entered the United States with the intent to remain permanently (if he could), by applying for and successfully pursuing adjustment of status under Section 245. Chen v. Foley, 385 F.2d 929, 935–936 (C.A. 6, 1967); Santos v. Immigration & Naturalization Service, 375 F.2d 262, 264 (C.A. 9, 1967); Castillo v. Immigration & Naturalization Service, 350 F.2d 1 (C.A. 9, 1965), aff'g Matter of Garcia-Castillo, 10 I. & N. Dec. 516 (1964), reconsideration denied, 10 I. & N. Dec. 790 (1964); Cubillos-Gonzalez v. Immigration & Naturalization Service, 352 F.2d 782 (C.A. 9, 1965); Matter of Muslemi, 12 I. & N. Dec. 616 (1968); Matter of Tonga, 12 I. & N. Dec. 212 (1967); Matter of Ramirez, 12 I. & N. Dec. 78 (1967); Matter of Leger, 11 I. & N. Dec. 796 (1966); Matter of Vega, 11 I. & N. Dec. 337 (1965); Matter of Rubio-Vargas, 11 I. & N. Dec. 167 (1965).

7. This decision is attached to the petitioner's motion to remand filed October 6, 1970, which was subsequently denied.

Petitioners, husband and wife, are natives of Kabul, Afghanistan. They entered the United States at New York on February 5, 1968 as temporary visitors for pleasure, authorized to remain in that status until March 15, 1968. On February 10, 1968 the husband obtained forms from the Philadelphia office of the Immigration and Naturalization Service to apply for adjustment of status. The husband-petitioner mailed the application with a transmittal letter dated February 15, 1968 to the Philadelphia office of the Immigration and Naturalization Service where it was received on February 19, 1968. With that application he furnished to the District Director a letter from the J. M. Foster Co., Inc. advising that petitioner had been referred to it by the Pennsylvania Bureau of Employment Security, and that they would like to hire him as an accountant. On March 1, 1968 the District Director in Philadelphia returned the forms to petitioner with a letter advising that he had to obtain a Labor Department Alien Employment Certificate through the Pennsylvania Bureau of Employment Security. This advice was erroneous, because, as the Board concedes in its opinion, under the regulations of the United States Department of Labor then in effect, 29 C.F.R. § 60.-3(b) (Sept. 2, 1967), the Immigration and Naturalization Service was required to process an application for such a certificate on behalf of an accountant clerk.

Petitioner attempted, however, to comply with the District Director's March 1, 1968 letter by having the J. M. Foster Co., Inc. fill out application form E.S. 575B, and by filling out application form E.S. 575A, and filing both with the Pennsylvania Bureau of Employment Security. On April 4, 1968, that office advised the District Director by letter that it was processing the application. On April 8, 1968, petitioner resubmitted his application to the District Director with copies of the applications he filed with the Bureau of Employment Security.

Meanwhile, on April 3, 1968 the District Director, having on March 1, 1968 erroneously returned petitioners' application for a change of status, issued an Order to Show Cause and Notice of a Hearing on April 15, 1968 in deportation proceedings under § 242(b) of the Immigration and Nationality Act, 8 U.S.C. § 1252(b) (1964). The Notice, which was served on April 4, 1968, charged that after admission as a nonimmigrant under § 101(a) (15) of the Act, 8 U.S.C. § 1101(a) (15) (B) (1964), petitioners remained in the United States for a longer time than permitted. Thus, because the District Director erroneously returned petitioners' papers on March 1, 1968, they became subject to deportation on March 15, 1968 as overstayed visitors even though, as is pointed out hereinafter, they met the statutory requirements of eligibility for adjustment of status under § 245.

On April 15, 1968, both petitioners appeared before the special inquiry officer. They were not represented by counsel. The female respondent spoke no English; the male respondent had a limited command of English. The special inquiry officer advised the petitioners that he could consider their application for adjustment of status, and an application for voluntary departure in lieu of deportation. Such advice was required by 8 C.F.R. § 242.17, but the record of the April 15, 1968 hearing would not support a conclusion that either petitioner appreciated the significance of the special inquiry officer's brief references. At the conclusion of the hearing an oral decision was delivered, denying adjustment of status and ordering deportation.

Thereafter, petitioners retained counsel, who on their behalf filed a timely notice of appeal to the Board of Immigration Appeals which on July 18, 1968 granted an application to reopen the § 242(b) hearing for additional evidence. A reopened hearing was held before the same special inquiry officer on November 22, 1968 and December 13, 1968. This time petitioners were represented by counsel, and an English-Persian translator was present. In the reopened

hearing, counsel on behalf of petitioners conceded their deportability as overstayed visitors, but contended that they should be afforded the discretionary relief of adjustment of status, § 245, or of voluntary departure in lieu of deportation, § 244. 8 U.S.C. § 1254(e) (1964). The only witness who testified in either the reopened or the original hearing was the husband-petitioner; a stipulation was made at the reopened hearing with respect to the wife's testimony. At the reopened hearing it was conceded that petitioners met the statutory requisites for eligibility for adjustment of status under § 245. Testimony was directed solely to the exercise of discretion with respect to adjustment of status or voluntary departure in lieu of deportation.

Following the hearing, the special inquiry officer granted voluntary departure, but denied adjustment of status. His decision states:

I am denying the applications for adjustment of status as a matter of discretion for two reasons: first, the respondents have been in the United States for a period of only one year as of the present time, and, second, because it is my finding that the respondents intended to remain in the United States permanently or at least indefinitely at the time of their entry and admission as nonimmigrants.

The special inquiry officer also found:

I specifically find that there is, in the record, no proof of fraud such as would render either of the respondents inadmissible under Section 212 (a) (19) of the Act.

Petitioners appealed the denial of adjustment of status to the Board of Immigration Appeals which affirmed, holding:

[The facts] establish that respondents entered with the intention of residing permanently. The entry of an alien with such an intention is a sufficient reason for denying relief.

\*   \*   \*   \*   \*   \*

The other reason given by the special inquiry officer—length of residence —is a factor which may be considered in determining whether discretion should be exercised.

The petition to this court challenges that holding.

The majority by its decision assumes that we have jurisdiction.[1] Moreover, since it discusses the facts extensively it assumes a scope of review which permits us to consider the Board's factual determinations as well as its exercise of discretion.[2] I agree that we have jurisdiction and that we can review both the Board's factual determination and its exercise of discretion. We must determine, first, whether the Board's findings of fact are supported by reasonable, substantial and probative evidence on the record considered as a whole, and next, whether in the light of those facts, and the congressional purpose in enacting § 245, there was any abuse of discretion.[3]

---

1. In Scalzo v. Hurney, 314 F.2d 675 (3 Cir. 1963) this court held that where a deportation order is challenged only insofar as it seeks review of the Board's refusal to adjust status, 8 U.S.C. § 1105a (1964) does not confer jurisdiction here. That holding has apparently been overruled by necessary implication from Foti v. Immigration and Naturalization Service, 375 U.S. 217, 84 S.Ct. 306, 11 L.Ed. 2d 281 (1963); Giova v. Rosenberg, 379 U.S. 18, 85 S.Ct. 156, 13 L.Ed.2d 90 (1964); and Cheng Fan Kwok v. Immigration and Naturalization Service, 392 U.S. 206, 88 S.Ct. 1970, 20 L.Ed.2d 1037 (1968), affirming 381 F.2d 542 (3 Cir. 1967). Review of adjustment of status decisions made in a hearing before a § 242(b) special inquiry officer is in this court rather than in the district court.

2. See 8 U.S.C. § 1105a(a) (4) (1964). Compare Wong Wing Hang v. Immigration and Naturalization Service, 360 F.2d 715, 717 (2 Cir. 1966) with Muskardin v. Immigration and Naturalization Service, 415 F.2d 865, 866 (2 Cir. 1969).

3. Possibly a different evidentiary standard applies where review is in the district court from a decision of the District Director. Compare "unsupported by substantial evidence," 5 U.S.C. § 706(2) (E) (Supp. IV, 1969), with "if support-

## THE FACTUAL DETERMINATION

The sole reason advanced by the Board for its decision to deny adjustment of status is the finding of the special inquiry officer that petitioners entered the United States on a visitors' visa with the subjective intention of remaining permanently. The length of residence here was said to be only a factor to be considered. Since, except for a stipulation as to what the wife's testimony would be, the only testimony before the special inquiry officer was by the husband-petitioner, it is to his testimony, and the exhibits introduced in evidence, that we must look for reasonable, substantial and probative evidence of their subjective intention. So far as it goes, the finding of subjective intention is supported by such evidence. I say so far as it goes, for the special inquiry officer does not go so far as to find that it was petitioners' intention to stay here permanently whether or not they could legally do so. Such a finding certainly would not on the record be supported by reasonable, substantial and probative evidence. On the contrary, the most that could be found with respect to the husband-petitioner's intention is that prior to his entry he was aware of the possibility of adjusting his status pursuant to § 245, and intended, if he was able to find work here, to make such an application. Read in this context, the finding as to his subjective intention is supported by the required evidence.

The opinion of the court refers to a "preconceived intention in Kabul, Afghanistan, of bypassing normal consular procedures for obtaining permanent residence." To the extent that this finding refers to a knowledge of the availability of the adjustment of status remedy, it is supported by the agency record. But the legal conclusion implicit in the use of the term "normal consular procedures" is my crucial difference with the majority. For implicit in the use of the words "normal consular procedures" is the unexpressed but clear assumption that any procedures other than consular procedures are "abnormal." I assume that Congress, when it enacted § 245, established a "normal" alternative to consular procedures, namely adjustment of status. The court must determine, therefore, whether or not a pre-entry subjective intention to apply for adjustment of status if the immigrant was able to find work here is, in the light of the Congressional purpose in enacting § 245, a sufficient reason for an adverse exercise of discretion.

## STANDARDS OF DISCRETION FOR ADJUSTMENT OF STATUS

Prior to 1952, if a person was in the United States temporarily or irregularly, but eligible for an immigration visa and quota number, there was no statutory method of obtaining such a visa without leaving the country and applying to a consulate. To alleviate hardships, the Immigration and Naturalization Service developed the practice of pre-examination, whereby under an agreement with Canada, eligible immigrants were examined by immigration officers in the United States, and when their admissibility was established, sent by prearrangement to a consul in Canada who issued a visa. A limited remedy of adjustment of status was enacted in the Act of June 27, 1952, Pub.L.No. 82–414, § 245, 66 Stat. 217, and subsequent amendments of the statute broadened its application. The administrative regulations sanctioning pre-examination were revoked in 1959. 24 Fed.Reg. 6477 (1959). See Bufalino v. Holland, 277 F.2d 270, 281 (3 Cir.), cert. denied, 364 U.S. 863, 81 S.Ct. 103, 5 L.Ed.2d 85 (1960). There is no clear administrative policy about acceptance of a visa application in a country other than that of the applicant's nationality. C. Gordon & H. Rosenfield, Immigration Law and Procedure § 7.36, at 7–25 (Rev. ed.

ed by reasonable, substantial, and probative evidence on the record considered as

a whole." 8 U.S.C. § 1105a(a) (4) (1964).

1969). Thus, if the statutory remedy of adjustment of status is unavailable, the petitioners would in all probability have to return to Afghanistan to obtain a visa for which they are eligible.

The limited adjustment of status procedures was amended in 1958, Act of Aug. 21, 1958, Pub.L.No. 85–700, § 1, 72 Stat. 699, and the legislative history of those amendments shows, more clearly than is often the case, what Congress had in mind.

> The administrative operations in the application of that section, and other related features of the general immigration law regarding adjustment of status of aliens within the United States, have been the subject of close scrutiny by the Committees on the Judiciary of both the Senate and the House of Representatives. For a considerable period of time, there has appeared to be a steadily mounting number of cases in which aliens determined by the Immigration and Naturalization Service to be eligible for permanent residence in the United States in accordance with all the applicable provisions of the Immigration and Nationality Act, had to comply with what appeared in those cases to be an unnecessary procedure known as preexamination and voluntary departure with a view toward applying for an immigrant visa in one of the United States consular offices in Canada. During the fiscal year ending June 30, 1958, more than 7,000 aliens in the United States had their eligibility to enter as immigrants determined in this country prior to sending them to Canada where they briefly appeared before a United States consular officer, and then returned to this country with an immigrant visa.

> In addition, the review of a considerable number of private relief immigration bills seeking adjustment of status of nonimmigrants has further demonstrated to the committee the desirability of general amendatory legislation on this subject.

> The language of the instant bill has been carefully drawn so as not to grant undeserved benefits to the unworthy or undesirable immigrant. This legislation will not benefit the alien who has entered the United States in violation of the law. Further, this legislation does not affect the statutory standards of eligibility for immigration into the United States, and it does not change in any way the numerical limitations as set forth in the existing immigration quotas. Essentially, this is a procedural measure designed to ameliorate existing practices and procedures developed by way of administrative regulations in existence, with minor changes, since 1935. S.Rep.No. 2133, H.R.Rep.No. 2258, 85th Cong., 2d Sess. (1958), 2 U.S. Code Cong. & Admin.News, p. 3699.

The reports also refer to saving of expense both by the Government and by the immigrant by eliminating the formalism of a trip to Canada. When, in 1960, the statute was amended, Act of July 14, 1960, Pub.L.No. 86–648, § 10, 74 Stat. 505, to eliminate as an eligibility requirement admission as a bona fide nonimmigrant, the Senate Report on the amending statute quoted with approval the above quoted language of S.Rep.No. 2133, repeated the ameliorating purposes of the legislation, and said:

> The Attorney General's interpretation (of the 1958 Amendment) will not only necessitate the reinstatement of the fallacious procedure known as "preexamination" and consisting of round trips to Canada for the sole purpose of obtaining an immigration visa, but will certainly greatly increase the number of private bills. The Congress has repeatedly expressed its disapproval of the "preexamination" procedure and has similarly expressed its dissatisfaction with the mounting volume of private legislation. S.Rep.No. 1651, H.R.Rep.No. 1433, 85th Cong., 2d Sess. (1960), 2 U.S.Code Cong. & Admin.News, p. 3137.

Considering the ameliorating purpose of the Congress in creating the adjustment of status remedy, and the history of successive amendments which have steadily widened eligibility,[4] it seems to me that refusal to permit adjustment of status, for the reason given here, was an abuse of discretion.

Prior to the July 14, 1960 amendment to § 245, the agency held that the existence of a preconceived intention to take advantage of the adjustment of status remedy after entry made the initial nonimmigrant entry non *bona fide*. Since *bona fide* nonimmigrant entry was a statutory prerequisite for adjustment of status, relief was denied. E. g., Matter of A, 8 I. & N.Dec. 655 (June 1, 1960). The July amendment eliminated this requirement for eligibility, and in September, 1960, in Matter of K.B.N., A–11726627, 9 I. & N.Dec. 50 (1960) the *Regional Commissioner wrote with respect to the amendment*:

Counsel is correct in his statement that entry as a *bona fide* nonimmigrant is not now a requirement for adjustment of status under the amended section 245. Congress left that former requirement out of the present statute to obtain more flexibility in the administration of this section of law. However, the wording "inspected and admitted" used by Congress in the present statute does not mean that any alien who was inspected and admitted, whether the admission was lawful or otherwise, would be accorded the benefits of this section of law. The Committee report accompanying H.J. 397, which later became the law, states: "* * * only those aliens who enter the United States in good faith and without any intention of circumventing *quota restrictions* of the Immigration and Nationality Act, or any other law relating to immigration shall be entitled to

the benefits of section 245(a), as amended." 1651, 86th Cong., 2d Sess., p. 27. (italics added).

The significant negative factor was the circumvention of *quota* restrictions. No circumvention of quota restrictions is involved in the instant case.

In Matter of Barrios, Int.Dec.No. 1264, 10 I. & N.Dec. 172, 174–175 (Bd. of Immigration App.1963), the Board rejected the contention that the subjective intention found here was sufficient to warrant denial of discretionary relief, and said:

Here we are confronted solely with a matter of discretion whereas the aliens in the cases referred to by the Service were both ineligible for relief in that they did not enter as *bona fide* nonimmigrants, a statutory element no longer present in Section 245. The only evidence we find germane to denying discretionary relief for the reason advanced by the Service, namely, "that it outrages all of the orderly processes of government to reward . . . subterfuge and evasion" is the respondent's testimony that he did not inform the consul in Switzerland of his "intentions" at the time the nonimmigrant visa was issued. * * * There is no showing in this record, however, that the respondent as a condition precedent to obtaining a nonimmigrant visa was required by the consul in Switzerland to state his ultimate "intention" after arrival in the United States.

In a case decided on the same day as *Barrios* the Board said with respect to the 1960 amendment to § 245 and with respect to the *Barrios* decision:

The amendment to section 245 (supra) was intended to broaden the scope of the Attorney General's authority in order that he may adjust in his discretion the status of all aliens

---

4. Act of June 27, 1952, Pub.L. No. 82–414, § 245, 66 Stat. 217, has been amended by Act of Aug. 21, 1958, Pub.L. No. 85–700, § 1, 72 Stat. 699; Act of July 14, 1960, Pub.L. No. 86–648, § 10, 74 Stat. 505; Act of Oct. 3, 1965, Pub.L. No. 89–236, § 13, 79 Stat. 918; and Act of Nov. 2, 1966, Pub.L. No. 89–732, § 1, 80 Stat. 1161.

other than alien crewmen and aliens residing in territories adjacent to the United States who enter the United States in good faith without any intention of circumventing the *quota* restrictions of the Immigration and Nationality Act. (See Committee Report, U.S.Code, Congressional and Administrative News, 86th Congress, 2d Session 1960 at pp. 3137, 3138 and 3147.) We have in a recent case (Barrios) adjusted the status of an alien from a nonquota area who entered the United States as a nonimmigrant. The alien concerned affirmatively established that although he had at some time in the past a desire to enter the United States for permanent residence, nevertheless at the time he secured his nonimmigrant visa he fully intended to comply with the terms of his temporary admission unless permitted to remain in the United States lawfully by taking advantage of a provision of the immigration laws designed to obviate the need for departure and reentry on his part. There was no showing in the case that the alien intended to circumvent the *quota* restrictions of the Immigration and Nationality Act. Matter of Sauer, Int.Dec.No. 1265, 10 I. & N.Dec. 177, 179 (Bd. of Immigration App.1963) (italics added) (footnote omitted).

In Matter of Tonga, Int.Dec.No. 1730, 11 I. & N.Dec. 623 (Bd. of Immigration App.1966), the Board rejected the same contention about pre-entry intent to apply for adjustment of status saying:

The respondent's statement that "it was his intention to remain permanently in the United States" was, as indicated by the special inquiry officer, qualified by the phrase:—"if he could." Thus limited, the respondent's recital is not necessarily indicative of a preconceived intent to circumvent the normal immigrant visa-issuing process. Very reasonably, the appended condition could be interpreted as a mental reservation depending for fulfillment upon future facts and the law permitting the possibility to become a reality.

Matter of Tonga, *supra*, stands somewhat alone in the decisions of the Board after January, 1963, however, and was in effect reversed in Matter of Tonga, Int. Dec.No. 1730, 12 I. & N.Dec. 212 (Bd. of Immigration Appeals, 1967). Beginning in 1964, the Board began to waiver in its adherence to *Barrios*. In Matter of Diaz-Villamil, Int.Dec.No. 1330, 10 I. & N.Dec. 494, 495 (Bd. of Immigration Appeals, 1964), for example, a case where discretionary relief was denied because of the applicant's evasiveness, the Board said that Barrios *"at the time he secured his nonimmigrant visa from the United States consular officer"* had every intention of complying with the terms of his temporary admission and this *was not controverted."* In Matter of Rubio-Vargus, Int.Dec.No. 1466, 11 I. & N.Dec. 167 (1965), relaying on *Diaz-Villamil, supra,* and ignoring *Barrios,* it announced the rule that attempting to circumvent foreign consular visa issuance procedures, rather than attempting to circumvent quota restrictions was the critical factor, and except for the first *Tonga* opinion it seems to have adhered to that view since. Agency cases cited by the majority, arising after *Diaz-Villamil,* though in the main distinguishable because of the presence of other negative factors, support this view. Cases before July, 1960 are not really relevant.

The inexplicable departure from established policies is an indication of abuse of discretion. Wong Wing Hang v. Immigration and Naturalization Service, *supra,* 360 F.2d at 719. I would hold that the inexplicable departure from the correct interpretation of § 245 announced in *Barrios* and *Sauer, supra,* is such an indication.

Moreover, the agency discretion must be tested against the statutory purpose. Pre-examination, the predecessor administrative remedy, was designed originally, at least in part, to alleviate hardship to refugees. These, certainly, for the most part arrive with the subjective intention of remaining permanently or at

least indefinitely. Congress intended to provide a simpler and more rational statutory substitute for pre-examination. It would be anomalous, indeed, if that statutory substitute were construed to permit denial of relief to persons who were probably its intended beneficiaries. By accepting the position of the Service and the Board, this court in effect holds that pre-entry knowledge of and intention to avail of a duly enacted statutory remedy is a valid reason for discretionary denial of that very remedy. Congress certainly did not intend to vest the Attorney General's designees with so irrational a discretion.

Respondents rely on cases in the Sixth and Ninth Circuits as establishing that denial of relief can be predicated on the immigrant's non-fraudulent subjective pre-entry intention to remain. Chen v. Foley, 385 F.2d 929 (6 Cir. 1967), cert. denied, 393 U.S. 838, 89 S.Ct. 115, 21 L. Ed.2d 109 (1968), certainly supports the Board's position. I think, however, that Chen v. Foley is based on a misconception of the congressional purpose in enacting § 245. The court makes reference to the fact that Chen had twice caused the introduction in Congress of private bills to accord him permanent residence, as tending to prove his pre-entry subjective intent, but makes no reference to the repeated legislative history showing that § 245 was designed to afford a simple substitute alternative for such bills. In Castillo v. Immigration & Naturalization Service, 350 F.2d 1 (9 Cir. 1965), and Cubillos-Gonzalez v. Immigration & Naturalization Service, 352 F.2d 782, 783 (9 Cir. 1965), there were, besides subjective pre-entry intent, additional negative factors indicating actual deception of the Service, and in *Castillo* the Ninth Circuit assumed a much more restricted scope of review than either the majority or I hold to be appropriate. If *Castillo* and *Cubillos-Gonzalez* stand for the proposition that subjective pre-entry intent to rely on a duly enacted statutory remedy is a "[f]lagrant disregard of lawful visa procedures;" *Castillo, supra,* 350 F.2d

at 4, I would decline to adopt that rule. Adjustment of status seems to me a lawful alternative to consular visa processing.

There remain for consideration the affirmative factors in the record which appear favorable for adjustment of status. These include the husband-petitioner's employment here as an accountant; the birth on July 6, 1968, of an American citizen child of petitioners' marriage; and a stipulation that the wife would testify that great hardship would be caused to that child if it were returned to Kabul, particularly because the kinds of baby food, medical care, and clothing available here would not be available there. These, certainly, were special equities, and so this case does not present the further problem whether or not, where an applicant's record is neutral, he must show special equities to obtain discretionary relief under § 245. See Santos v. Immigration and Naturalization Service, 375 F.2d 262 (9 Cir. 1967).

It may be that special inquiry officers regard a refusal to adjust status as a sort of less severe penalty for conduct for which they might otherwise order deportation and withhold the discretionary relief of voluntary departure. The latter course would subject the alien to disabilities under § 276 of the Act, 8 U. S.C. § 1326 (1964), and a pragmatic argument can be made in favor of allowing the Immigration and Naturalization Service unbridled discretion in refusing § 245 relief rather than encouraging imposition of more severe disabilities. The difficulty with this argument is the underlying assumption that the exercise of discretion under § 245 is in any way related to admissibility. Clearly it is not, for eligibility must exist before that discretion comes into operation. We should assume that discretion under § 245 should be or has been used as a means of softening the blow under §§ 242 and 244. 8 U.S.C. §§ 1252 and 1254 (1964).

I would hold that the Board and the special inquiry officer abused their dis-

cretion when they relied, in denying § 245 relief to eligible immigrants, on the sole adverse circumstance of the petitioners' subjective pre-entry intention to remain here and apply for such relief. I would reverse the order of the Board of Immigration Appeals of June 27, 1969 denying adjustment of status and remand to that Board with a direction to approve petitioners' application for adjustment of status. 28 U.S.C. § 2347(a) (Supp. IV, 1969); 5 U.S.C. § 706(1) (Supp. IV, 1969).

Chief Judge HASTIE joins in this dissent and also believes that the reasoning of Judge FREEDMAN's dissent is sound.

Judge ALDISERT joins in this dissenting opinion.

FREEDMAN, Circuit Judge (dissenting).

I believe the Attorney General's subdelegation of the discretion conferred on him by 8 U.S.C. § 1255 is invalid because he failed to designate any policy objectives or standards, or even relevant factors to guide those he authorized to act in his name.

There is a critical difference between § 1255 which authorizes the Attorney General to grant adjustment of status as a permanent resident to an alien who has been admitted to this country, and § 1254 which authorizes him in his discretion to suspend deportation and grant adjustment of status to an alien ordered to be deported. This difference explains why Jay v. Boyd, 351 U.S. 345, 76 S.Ct. 919, 100 L.Ed. 1242 (1956), which upheld the Attorney General's delegation

of his discretion under § 1254, is inapplicable to the delegation of his discretion in this case under § 1255. Similarly distinguishable is United States ex rel. Hintopoulos v. Shaughnessy, 353 U.S. 72, 77 S.Ct. 618, 1 L.Ed.2d 652 (1957), which held that the Attorney General could look for guidance in exercising his discretion to what is now § 1254. Indeed, the difference between the two sections renders fully applicable to § 1255 the criticism which Mr. Justice Frankfurter unsuccessfully pressed in Jay v. Boyd.[1]

Let me sketch the differences between the two sections. In order to qualify under § 1254 for the discretionary suspension of deportation which was involved in Jay v. Boyd, the applicant must prove that his deportation would result in "extreme hardship" and in some cases in "exceptional and extremely unusual hardship" to him, or to his spouse, parents or child who is a citizen of the United States or an alien lawfully admitted for permanent residence. Section 1254 thus prescribes both the criterion of hardship and the extent to which the Attorney General must be persuaded of its existence. It also contains a singularly impressive check on the Attorney General's exercise of discretion in favor of the alien. The Attorney General must report monthly to each House of Congress all individual suspensions of deportation and the facts and the law which prompted his grant of discretionary relief. Either House may, in most cases, veto any suspension, and in the remaining cases, which deal with those deportable for morally or politically evil conduct, both Houses must affirmatively ap-

---

1. "If the Attorney General's conscience is satisfied to act on considerations that he does not desire to expose to the light of day or to impart to an alien whose liberty may be at stake, thereby involving the fate of an innocent family, Congress leaves him free to do so. But Congress has not seen fit to invest his subordinates with such arbitrary authority over the lives of men.

"* * * But, if in his wisdom the Attorney General devises a system for delegating the means for carrying out

the responsibility for which Congress has given discretion, he cannot also delegate his discretion. * * *

"* * * The Attorney General may act on confidential information and Congress has left him to square it with his conscience. But he cannot shelter himself behind the appearance of legal procedure—a system of administrative law—and yet infuse it with a denial of what is basic to such a system." 351 U.S. at 371–372, 76 S.Ct. at 934.

prove the Attorney General's grant of relief.[2]  See United States ex rel. Hintopoulos v. Shaughnessy, 353 U.S. 72, 78–79, 77 S.Ct. 618, 1 L.Ed.2d 652 (1957).

All this is utterly unlike § 1255, which merely provides that the Attorney General shall exercise his discretion on an application by an eligible alien for an adjustment of status. No basis whatever is prescribed for the Attorney General's exercise of discretion; the statute simply declares that he is to act "in his discretion and under such regulations as he may prescribe." (§ 1255(a)) In subdelegating his authority to the Board of Immigration Appeals, the Attorney General has provided as the only guidance that "in considering and determining cases before it * * * the Board shall exercise such discretion and authority conferred upon the Attorney General by law as is appropriate and necessary for the disposition of the case." [3]

It is this lack of any express or implicit specification of policy objectives or standards or even relevant factors, either in § 1255 or in the regulations promulgated by the Attorney General, which makes the exercise of discretion by his delegates an utterly unguided and unpredictable undertaking. Only the inevitable necessity of disposing of the case is specified, like a result without a cause. What is the desired goal and what guides should channel the course to it receive no recognition. Nor is this an instance in which a general problem is assigned to an official or agency and discretion vested in it in order to obtain an expert solution and judgment.

Section 1255 was written with Congressional knowledge that the Attorney General personally would not decide applications for adjustment of status but would delegate his authority to subordinate officials. Congress was aware that the Attorney General had established a quasi-judicial system for processing applications seeking the discretionary relief he was authorized to grant under the Immigration and Nationality Act. It specifically provided in 8 U.S.C. § 1103 for his subdelegation of the duties and powers imposed upon him in cases such as this. Prior to the enactment of § 1255, the Attorney General had promulgated the regulation delegating all such functions to the Board of Immigration Appeals.[4] Indeed, by the time of the 1960 amendment, it was well known that § 1255 applications were far too numerous for the Attorney General to determine them personally.[5] Thus, an impersonal procedural structure has been erected with the knowledge of Congress, but no proper authority has prescribed the goals sought to be achieved, the factors to be considered or the weight to be assigned them, or the burden which the applicant must carry, as a guide or direction to those charged with administering § 1255 or to the courts which are called upon to review their action.

What has happened here shows the result of such a wide-open system. The Board has held, and the majority agrees, that the refusal of adjustment of status is justified because the aliens intended to remain here. Judge Gibbons concludes that there was an abuse of discretion because the denial of adjustment of status was based on this factor which in his view could no longer be deemed significant in the exercise of discretion after Congress removed it as an absolute

---

2. 8 U.S.C. § 1255(c). There is a similar provision in 8 U.S.C. § 1255b pertaining essentially to diplomatic personnel and limited to no more than fifty applicants annually.

3. 8 C.F.R. § 3.1(d) (1) provides:
"Powers of the Board. (1) Generally. Subject to any specific limitation prescribed by this chapter, in considering and determining cases before it as provided in this part the Board shall exercise such discretion and authority conferred upon the Attorney General by law as is appropriate and necessary for the disposition of the case."

4. 8 C.F.R. § 3.1(d) (1), quoted supra, n. 3.

5. The legislative history of the 1960 amendment shows that over 20,000 applications for adjustment of status under § 1255 were approved annually.

bar.[6] If Judge Gibbons' view had prevailed, at least one element would now have been established, although only as a non-factor.

It is true that other courts of appeal have upheld the exercise of discretion under § 1255.[7] I would not follow these cases because they do not recognize the distinction between § 1255 and § 1254.

I therefore would vacate the order of the Board of Immigration Appeals denying adjustment of status to the appellants and would remand the case to the Board to hear their application after the provision of reasonable standards by the Attorney General.

Judge ALDISERT also joins in this dissenting opinion.

---

6. Act of July 14, 1960, P.L. 86–648, § 10, 74 Stat. 606, amending § 245 of the Immigration and Nationality Act, 8 U.S.C. § 1255, by eliminating admission to the United States "as a bona fide nonimmigrant" as an eligiblity requirement to adjustment of status.

7. E. g., Jarecha v. I. N. S., 417 F.2d 220 (5 Cir. 1969); Chen v. Foley, 385 F.2d 929 (6 Cir.), cert. denied 393 U.S. 838, 89 S.Ct. 115, 21 L.Ed.2d 109 (1967); Santos v. I. N. S., 375 F.2d 262 (9 Cir. 1967); Castillo v. I. N. S., 350 F.2d 1 (9 Cir. 1965). See also Annot., Construction and Application of § 245 of the Immigration and Nationality Act of 1952 (8 U.S.C. § 1255) Authorizing Adjustment of Status of Alien to that of Permanent Resident, 4 A.L.R.Fed. 557 (1970).