**Norma Andalis BAGAMASBAD, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

**No. 74–1440.**

United States Court of Appeals, Third Circuit.

Argued April 8, 1975.

Reargued Nov. 4, 1975.

Decided Jan. 16, 1976.

As Amended Feb. 9, 1976 and March 8, 1976.

---

Filindo B. Masino, Berk, Masino, Moonblatt & McDougall, Philadephia, Pa., for petitioner.

John L. Murphy, Chief, Government Regulation Section, Crim. Div., Mary Jo Grotenrath, Dept. of Justice, Washington, D. C., for respondent.

Argued April 8, 1975.

Before BIGGS, VAN DUSEN and ALDISERT, Circuit Judges.

Reargued Nov. 4, 1975.

Before SEITZ, Chief Judge, and BIGGS, VAN DUSEN, ALDISERT, ADAMS, GIBBONS, ROSENN, HUNTER, WEIS and GARTH, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

The narrow issue presented in this alien's petition for review of an order of the Board of Immigration Appeals is whether Section 245(a) of the Immigration and Nationality Act, 8 U.S.C. § 1255(a),[1] requires the Attorney General to make an eligibility determination before he can exercise his discretion. The Board held that the immigration judge could pretermit the eligibility issue and could deny the application for status adjustment as an exercise of discretion. We set aside the Board's order and remand for further proceedings.

Petitioner, a native and citizen of the Philippines, entered the United States at Honolulu, Hawaii, on July 12, 1968, as a nonimmigrant visitor for pleasure. Having overstayed her visit, she applied, pursuant to § 245 for an adjustment of her status to that of a permanent resident. On February 21, 1973, the Philadelphia District Director denied her application in the exercise of

1. The status of an alien, other than an alien crewman, who was inspected and admitted or paroled into the United States may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is approved.

discretion and granted her 30 days to effect her voluntary departure from the United States. Because petitioner remained in the United States beyond the 30-day period, she was ordered to show cause why she should not be deported. At the April 19, 1973, deportation hearing, petitioner renewed her application for adjustment of status, conceded deportability, and admitted she had misrepresented her occupation when she applied for her visa. She had listed her occupation as a merchant; she was a teacher. She also had represented that she had not earned a college degree when, in fact, she had received a B.S. in Medical Technology in 1966.

In her written decision, the immigration judge denied petitioner's renewed application, reasoning that petitioner's "material, deliberate misrepresentations" did not merit a favorable exercise of administrative discretion. It is conceded that the Immigration Service made no specific determination of petitioner's eligibility for adjustment of status prior to denying her application as a matter of discretion.

Petitioner does not seek judicial review of the exercise of discretion. Rather, she urges that, irrespective of the discretionary denial of status adjustment, an eligibility determination is both extremely important to her and statutorily mandated.[2]

I.

Petitioner asserts that the importance of an eligibility determination will surface when, after departing from the United States pursuant to the Board's order, she applies to a consular office for an immigrant visa. "Respondent's finding of fraud . . . might very well indicate to a con-

sular officer abroad, reviewing the Petitioner's application for an immigrant visa in the future, that the Petitioner is excludable from admission . . . ." Petitioner's Brief at 12.

An overview of the duties of consular officers and an explanation of the transfer of their duties to the Attorney General under § 245 place petitioner's apprehension in perspective. Therefore, we now turn our attention in those directions.

If an alien seeks admission into the United States as an immigrant, he completes a visa application before a consular officer. The consular officer then has an affirmative duty to determine the alien's eligibility for a visa. *See* 8 U.S.C. § 1201(g). Congress has provided that certain classes of aliens are statutorily ineligible to receive visas:

(a) Except as otherwise provided in this chapter, the following classes of aliens shall be ineligible to receive visas and shall be excluded from admission into the United States:

. . . . .

(19) Any alien who seeks to procure, or has sought to procure, or has procured a visa or other documentation, or seeks to enter the United States, by fraud, or by willfully misrepresenting a material fact . . . . .

8 U.S.C. § 1182. Thus, if the consular officer were to determine that the alien fell within this classification, no visa would issue.

We were told by government counsel at oral argument that, unlike final deportation orders of the INS, 8 U.S.C. § 1105a,[3] eligibility determinations of consular officers are not subject to judicial

---

2. In *Ameeriar v. INS*, 438 F.2d 1028 (3d Cir.) (in banc), *petition for cert. dismissed pursuant to Sup.Ct. Rule 60*, 404 U.S. 801, 92 S.Ct. 21, 30 L.Ed.2d 34 (1971), the government conceded that "petitioners [had] met the statute requisite for eligibility of adjustment of status . . ." *Ibid.* at 1029. Recognizing that "[a]djustment of status is . . . a matter of administrative grace [and], not mere statutory eligibility", *ibid.* at 1030, the narrow question before us was whether there was a proper exercise of

unfavorable discretion by the Attorney General. Thus, *Ameeriar* did not present, nor did we decide, the precise question now before us.

3. The rule of review of final deportation orders obtains even where the challenge to the deportation order seeks review only of a denial of the adjustment of status. *Ameeriar v. INS, supra* n. 2, 438 F.2d at 1035 n. 1 (Gibbons, J., dissenting). The majority opinion in *Ameeriar* assumed jurisdiction existed.

review. Indeed, government counsel suggested that not even an administrative appeal to the Secretary of State lies from the consular officer's determination.[4] Therefore, the consular officer plays a significant role in the alien admission process.

If the alien, other than an alien crewman, is in the United States, he may apply to the Attorney General under § 245 for an adjustment of status to that of an alien lawfully admitted for permanent residence. However, the application can be granted only if the Attorney General determines he "is eligible to receive an immigrant visa." 8 U.S.C. § 1255(a)(2). Therefore, the statutory classifications of ineligibility, 8 U.S.C. § 1182, would apply with equal force in a § 245 proceeding. Consequently, the failure of the immigration judge to determine first whether petitioner was an alien "eligible to receive an immigrant visa", 8 U.S.C. § 1255(a)(2), is doubly important to petitioner, especially where, as here, the immigration judge characterized her misrepresentations as material and deliberate.

Petitioner's apprehension of the practical consequences of the immigration judge's failure to make an eligibility determination

certainly is not controlling. Our task is to analyze the statute itself, and it is to this that we now turn.

II.

Section 245(a) provides in pertinent part:

The status of [a nonimmigrant] alien, . . . who was inspected and admitted or paroled into the United States may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is approved.

Petitioner argues that this sub-section requires a determination by the Attorney General that the three express conditions are met before he can deny adjustment of status as a matter of discretion. Although the language of the statute is not as specific as it could be, we find much logic to the contention. Analogous case law furthers

---

4. 8 U.S.C. § 1104(a) provides in part:

(a) The Secretary of State shall be charged with the administration and the enforcement of the provisions of this chapter and all other immigration and nationality laws relating to (1) the powers, duties, and functions of diplomatic and consular officers of the United States, *except those powers, duties, and functions conferred upon the consular officers relating to the granting or refusal of visas* . . . . .

(Emphasis supplied.)

State Department regulations, 22 C.F.R. § 42.130 (1974), do permit a limited review of refusals to issue immigrant visas:

(b) *Review of refusals at consular offices.* If the ground of ineligibility upon which the visa was refused cannot be overcome by the presentation of additional evidence, the principal consular officer at a post, or an alternate whom he may specifically designate, shall review the case of each applicant who has been refused a visa and shall record his decision over his signature and the date on a form prescribed by the Department. If the grounds of ineligibility may be overcome by the presentation of additional evidence, and if the applicant has indicated that he intends

to obtain such evidence, a review of the refusal may be deferred for a period not to exceed 120 days. If the principal consular officer, or his alternate, does not concur in the refusal, he shall (1) refer the case to the Department for an advisory opinion, or (2) assume responsibility for the case himself.

(c) *Review of refusals by the Department.* The Department may request a consular officer in an individual case or in specified classes of cases to submit a report if an immigrant visa has been refused. The Department will review such reports and may furnish an advisory opinion to the consular officer for his assistance in giving further consideration to such cases. If upon the receipt of the Department's advisory opinion the consular officer contemplates taking action contrary to the advisory opinion, the case shall be resubmitted to the Department with an explanation of the proposed action. Rulings of the Department concerning an interpretation of law, as distinguished from an application of the law to the facts, shall be binding upon consular officers.

The review procedures for a refusal to issue a nonimmigrant visa are set forth in 22 C.F.R. § 41.130 (1974).

the argument, and the legislative history of amendments to § 245 does not detract from it.

### A.

In support of her contention petitioner relies heavily on *Jay v. Boyd*, 351 U.S. 345, 76 S.Ct. 919, 100 L.Ed. 1242 (1956). There, the alien brought a habeas corpus action testing the validity of the denial of his application, under § 244(a)(5) of the Act, 8 U.S.C. § 1254(a)(5),[5] for discretionary suspension of deportation. In the course of its opinion affirming the denial of discretionary suspension, the Court referred to the conditions of eligibility for discretionary relief as "the first step in the . . . procedure," *ibid.* at 352, 76 S.Ct. at 924, and stated: "Eligibility for the relief here involved is governed by specific *statutory* standards which provide a *right* to a ruling on an applicant's eligibility." *Ibid.* at 353, 76 S.Ct. at 924 (emphasis added).

Although *Jay* was not an adjustment of status proceeding, the statutory structure of § 244 was strikingly similar to that of § 245. The government attempts to dilute the Court's express declaration. It suggests that the regulations summarized in *Jay* required an eligibility determination before an exercise of discretion could take place; currently, the regulations do not require this two-step process.

In 1952 the regulations required the immigration judge to present evidence bearing on the applicant's eligibility for relief, 8 C.F.R. Rev. § 242.53(c) (1952) and further required a "written decision" with "a discussion of the evidence relating to the alien's eligibility for such relief and the reasons for granting or denying such application." 8 C.F.R. Rev. § 242.61(a) (1952).

Now, "the only burden on the Immigration Judge in the present case was to make a decision, written *or oral,* which discusses the 'evidence and findings as to deportability' and which contains 'a discussion of the evidence pertinent to any application made by [the alien] under section 242.17 [*e. g.,* § 244 and § 245 applications] and the reasons for granting or denying the request.' 8 C.F.R. § 242.18(a). Under the newer regulations, gone is the requirement that the Immigration Judge discuss the alien's eligibility for discretionary relief." Respondent's Brief at 8.

The government's argument runs into two walls. First, the current regulation does not set forth *what* determinations must be made. It does not say that an immigration judge can or cannot pretermit the § 244 or § 245 conditions and deny the application as an exercise of discretion. Thus, the current regulation supplies no support to the government's position.

Second, the government misreads the explicit language of *Jay v. Boyd, supra,* which states that *statutory* standards provided the alien's *right* to a Section 244 eligibility ruling. The Court did not say that the standards were imposed by *regulations* of the Attorney General or that the Attorney General could pretermit such a determination.

Analogizing the statutory formulation in § 244 to that in § 245, we find much force and logic in the Court's pronouncement in *Jay.* First, § 245(a) explicitly mandates the satisfaction of three conditions before the Attorney General *can* exercise his discretion in *favor of* permanent resident status. Second, there is no question that if the Attorney General *does* exercise favorable discretion, all three requirements must be satisfied. Third, if a point is reached where

---

5. It then provided:

As hereinafter prescribed in this section, the Attorney General may, in his discretion, suspend deportation and adjust the status to that of an alien lawfully admitted for permanent residence, in the case of an alien who— (5) is deportable . . .; has been physically present in the United States for . . . ten years . . . and proves that during all of such period he has been and is a person of good moral character; has not been served with a final order of deportation . . . up to the time of applying . . . for suspension of deportation; and is a person whose deportation would, in the opinion of the Attorney General, result in exceptional and extremely unusual hardship . . . ..
1952 U.S.Code Cong. & Admin.News pp. 166, 214–15.

the Attorney General concludes that the alien should be denied relief as a matter of discretion, it would seem to follow that the applicant has the right to assume he has met all three qualifications. Otherwise, the exercise of unfavorable discretion would appear to be a meaningless, unnecessary act. *See Ameeriar v. INS, supra* n.2, 438 F.2d at 1040 (Gibbons, J., dissenting) ("eligibility must exist before that discretion comes into operation").

The Board disagrees. It held that the immigration judge is not required to find eligibility. Therefore, under the Board's holding, petitioner cannot even rely on an implied finding of eligibility. We fail to see the logic of this holding. Moreover, the interest in orderly administrative and judicial review commands the Supreme Court statement. Contrasted with the procedures regulating a determination of eligibility by a consular officer,[6] there is, as heretofore observed, a statutory right to administrative and judicial review of the § 245 determination.[7] Thus, *Jay v. Boyd, supra,* supports persuasively the statutory interpretation sought by petitioner.

### B.

Having unsuccessfully distinguished *Jay,* the government seeks comfort in *Silva v. Carter,* 326 F.2d 315 (9th Cir. 1963), *cert. denied,* 377 U.S. 917, 84 S.Ct. 1181, 12 L.Ed.2d 186 (1964). There, a similar issue came before the court under the framework of §§ 212(g) and 249 of the Act. Like § 244 in *Jay v. Boyd, supra,* the provisions of §§ 212(g) and 249 in *Silva v. Carter, supra,* are similar in structure to those of § 245. Therefore, we will draw analogies from them.

In *Carter,* the acting regional commissioner denied Silva's application on the basis that Silva did not merit the Attorney General's favorable exercise of discretion. Explicit eligibility conditions had to be met, but the Commissioner did not determine whether Silva had satisfied the requirement that his admission not be contrary to the national welfare, safety or security of the United States. The crucial distinction between *Carter* and our case lies in the reasons for exercising unfavorable discretion. In *Carter* the reasons for exercising unfavorable discretion had nothing to do with the national welfare requirement. Therefore, there was "nothing to indicate that discretionary relief was denied by the regional commissioner on the ground of ineligibility." *Ibid.* at 320.

Here, the misrepresentations in petitioner's visa application formed the basis for the exercise of unfavorable discretion. These identical misrepresentations could render petitioner ineligible to receive an immigrant visa. 8 U.S.C. §§ 1182(a)(19), 1255(a)(2).[8] Thus, unless the question of her eligibility is now determined, there is no way of knowing whether the denial of relief encompassed a tacit finding of ineligibility.

### C.

The legislative history of § 245 does not support the restrictive interpretation urged by the government. Much of this history has been set forth by Judge Gibbons, dissenting in *Ameeriar v. INS, supra,* 438 F.2d at 1036–38.

Prior to 1952, if a person was in the United States temporarily or irregularly, but eligible for an immigration visa and quota number, there was no statutory method of obtaining such a visa without leaving the country and applying to a consulate. To alleviate hardships, the Immigration and Naturalization Service developed the practice of pre-examination, whereby under an agreement with Canada, eligible immigrants were exam-

---

6. *See supra* at 114 n.4.

7. *See* n.3 *supra.*

8. Petitioner sought an administrative determination that her misrepresentations were immaterial and emphasized the standards discussed in *Matter of S- and B-C-,* 9 I & N Dec. 436

(1961). As her counsel argued before the Board: "Sticking out like a red flag before a red bull was the question of fraud, deceit, misrepresentation, before the consular officer abroad, at the time Miss Bagamasbad applied for her B–2 visa." App. at 4.

ined by immigration officers in the United States, and when their admissibility was established, sent by prearrangement to a consul in Canada who issued a visa. A limited remedy of adjustment of status was enacted in the Act of June 27, 1952, Pub.L. No. 82–414, § 245, 66 Stat. 217, and subsequent amendments of the statute broadened its application. The administrative regulations sanctioning pre-examination were revoked in 1959. 24 Fed.Reg. 6477 (1959). See *Bufalino v. Holland*, 277 F.2d 270, 281 (3 Cir.), cert. denied, 364 U.S. 863, 81 S.Ct. 103, 5 L.Ed.2d 85 (1960).

*Ibid.* at 1036.

■ We are persuaded that the intent of the 1958 and 1960 amendments to § 245 was to streamline this aspect of the immigration process—to provide a method for determining whether the "alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence", without the necessity of pre-examination in the United States and subsequent physical departure to a foreign-based American consul to obtain a visa. The Senate Committee on the Judiciary described the amendment as "a procedural measure designed to ameliorate existing practices and procedures developed by way of administrative regulations". S.Rep. No. 2133, 85th Cong., 2d Sess.(1958), 1958 U.S.Code Cong. & Admin. News pp. 3698, 3699.

Judge Gibbons has explained further:

The reports also refer to saving of expense both by the Government and by the immigrant by eliminating the formalism of a trip to Canada. When, in 1960, the statute was amended, Act of July 14, 1960, Pub.L. No. 86–648, § 10, 74 Stat. 505, to eliminate as an eligibility requirement admission as a bona fide nonimmigrant, the Senate Report on the amending statute quoted with approval the above quoted language of S.Rep. No. 2133, repeated the ameliorating purposes of the legislation, and said:

"The Attorney General's interpretation (of the 1958 Amendment) will not only necessitate the reinstatement of the falla-cious procedure known as 'preexamination' and consisting of round trips to Canada for the sole purpose of obtaining an immigration visa, but will certainly greatly increase the number of private bills. The Congress has repeatedly expressed its disapproval of the 'preexamination' procedure and has similarly expressed its dissatisfaction with the mounting volume of private legislation." 438 F.2d at 1037.

Under the former practice, therefore, pre-examination inquired into an alien's statutory eligibility for admission into the United States as an immigrant alien. As we read the legislative history, the amendments to § 245 were procedural in nature. They sought "to ameliorate existing practices and procedures". They did not, as the government would have us hold, replace the existing law with one requiring an eligibility determination *only if* favorable discretionary action were indicated.

### III.

The finding of eligibility *vel non* under § 245 is extremely critical to this petitioner. If she is found to be ineligible for adjustment and thus deportable, she has a right to administrative and judicial review. The Supreme Court has said that the "finding of eligibility involves questions of fact and law". *Foti v. INS*, 375 U.S. 217, 228–29 n.15, 84 S.Ct. 306, 313, 11 L.Ed.2d 281 (1963). *Rusk v. Cort*, 369 U.S. 367, 379–80, 82 S.Ct. 787, 794, 7 L.Ed.2d 809 (1962), teaches that, in matters arising under the Immigration and Nationality Act of 1952, "the Court will not hold that the broadly remedial provisions of the Administrative Procedure Act are unavailable to review administrative decisions under the 1952 Act *in the absence of clear and convincing evidence that Congress so intended.*" (Emphasis supplied.) *See also Abbott Laboratories v. Gardner*, 387 U.S. 136, 140, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

As the government related at oral argument and as we indicated earlier, Congress has provided explicitly that there be no review of a consul's denial of a visa for

want of statutory eligibility. However, we cannot accept the notion that Congress would sanction procedures whereby there could be *no* judicial review of an adverse finding on the very important question of statutory eligibility of an immigrant for admission to the United States. Yet this is the very real practical effect of the interpretation the government urges upon us. *See* Part I *supra.* Given the Supreme Court's direction that "only upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review," *Abbott Laboratories v. Gardner, supra,* 387 U.S. at 141, 87 S.Ct. at 1511, petitioner's interpretation of § 245 emerges as the only method to insure administrative and judicial review of the question of statutory eligibility.[9]

### IV.

Finally, we find much merit to petitioner's contention that, under the facts of her case, it is important that there be administrative and judicial review of the effect of her prior misrepresentations. Case law and the Attorney General's interpretation of § 1182(a)(19) distinguish among various forms of misrepresentations on visa applications. *See, e. g., La Madrid-Peraza v. INS,* 492 F.2d 1297 (9th Cir. 1974) (per curiam); *Matter of S- and B-C-, supra,* 9 I & N Dec. at 447. Moreover, if she is found to be eligible for a visa and discretion is exercised adversely to her, she may then reappear before a consular officer armed with whatever persuasive authority may be accorded

the Attorney General's eligibility determination.

We are not impressed by the government's contention that, in any event, the consular officer would not be bound by the Attorney General's determination of eligibility or by a judicial determination thereof. At this stage of the proceedings, we cannot speculate on what effect the Attorney General's determination of eligibility would have on a representative of the State Department. Nor do we have before us a case or controversy requiring a decision on the jural implications of a consular officer's refusal to respect a final judgment of a federal court.

█ We conclude that the statutory schema of § 245 requires a determination of eligibility as a prerequisite to any exercise of discretion by the Attorney General so that an alien, physically present in the United States, could avail himself of administrative and judicial review. We perceive as applying to this provision the same reasoning employed by former Chief Justice Warren, speaking for the Court in *Foti v. INS, supra* :

> Since a special inquiry officer [immigration judge] *cannot* exercise his discretion to suspend deportation until he finds the alien statutorily eligible for suspension, a finding of eligibility and an exercise of (or refusal to exercise) discretion may properly be considered as distinct and separate matters.

375 U.S. at 228–29 n.15, 84 S.Ct. at 313 (emphasis added).

9. The commentators also have observed the importance of distinguishing the two-step nature of the procedure and the concomitant difference in the review available. *See* 2 C. Gordon & H. Rosenfield, Immigration Law and Procedure § 8.14, at 8–94—8–95 (rev. ed. 1975) (footnotes omitted):

> Some discretionary actions may have two phases. First there is a determination whether the applicant satisfies preliminary standards of eligibility prescribed by the statute. An applicant is entitled to have his eligibility determined. Generally, that determination involves issues of law and is subject to judicial review on a contention that the interpretation is erroneous. In some instances, however, the preliminary appraisal of eli-

gibility may involve issues of fact, e. g., good moral character or hardship. Such factual determinations are subject only to limited judicial review, apparently only on a showing of arbitrariness.

> Even if he satisfies the preliminary qualifications the applicant is not automatically entitled to relief. Then the second feature of the administrative consideration comes into play and involves the exercise of discretion. In most instances which are presented to the courts the administrative officers have found that the applicant is eligible under the statute but have denied relief in the exercise of discretion. Such a discretionary determination is immune from attack unless it is shown to be clearly arbitrary.

The order of the Board of Immigration Appeals will be set aside and the cause remanded for proceedings consistent with the foregoing.

VAN DUSEN, Circuit Judge (dissenting):

I respectfully dissent because I believe that the majority opinion extends the scope of judicial review of action by the Attorney General under Section 245 of the 1952 Immigration and Nationality Act, 8 U.S.C. § 1255, beyond that authorized by the applicable congressional statutes, as implemented by Executive Regulations and construed by the Supreme Court of the United States.

Unlike the majority, I believe that the statutory language in 8 U.S.C. § 1255(a) and analogous case law only requires the Attorney General to examine the facts and decide whether to exercise his "discretion" on an application for adjustment of status to that of an alien lawfully admitted for permanent residence in cases where he determines not to grant such discretionary relief. The inclusion in the congressional statute of three other pre-conditions for the grant of any application under § 1255(a)[1] does not preclude the Attorney General from denying relief on the basis of the first pre-condition listed in the statute, namely, "the status of an alien . . . may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe.[2] to that of an alien lawfully admitted for permanent residence if . . . .."

Congress has, therefore, provided that the Attorney General, not the courts, shall make the decision on any application for adjustment of status "in his discretion."[3]

In *Silva v. Carter*, 326 F.2d 315, 320 (9th Cir. 1963), the court said:

"If the lack of an express ruling on the second eligibility requirement is to be taken as an indication that no determination whatever was made as to that matter, Silva was likewise not prejudiced. In that event the matter left to the Attorney General's discretion must have been exercised without reference to the facts concerning eligibility. This is as it should be, whether or not there are express rulings on the questions of eligibility. Had the regional commissioner ruled that Silva met both eligibility tests, he was still empowered to deny the request for waiver in the exercise of discretion. His power could not be less where no such ruling had been made.

"Silva calls attention to *Jay v. Boyd*, 351 U.S. 345, 353, 76 S.Ct. 919, 100 L.Ed. 1242, a case involving the discretionary form of relief known as suspension of deportation. The court there said that eligibility for such relief 'is governed by specific statutory standards which provide a right to a ruling on an applicant's eligibility.' Granting the application, by analogy, of this statement to the problem now before us, we do not believe that it helps Silva.

". . . [T]here is here nothing to indicate that discretionary relief was denied by the regional commissioner on the ground of ineligibility. Thus Silva could not possibly have been prejudiced by the lack of an express ruling as to eligibility.

"We conclude that the regional commissioner did not err in denying the request for waiver on the discretionary ground, without first making an express ruling on the second element of statutory eligibility specified in section 212(g)." (Footnotes omitted.)

---

1. The other three statutory pre-conditions are:
    (1) An application for the described adjustment of status.
    (2) Eligibility to receive an immigrant visa and admissibility to this country for permanent residence.
    (3) Immediate availability of an immigrant visa at the time the application is approved. The language of the statute is quoted under II (page 114) of the majority opinion.

2. In *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954), the Court approved the delegation of preliminary administrative proceedings to quasi-judicial administrative officials of the Immigration Service, including the Board of Immigration Appeals.

3. See *SEC v. Chenery Corp.*, 318 U.S. 80, 87–88, 63 S.Ct. 454, 87 L.Ed. 626 (1943).

As noted below, the record and statistics subject to judicial notice make these points clear:

A. Petitioner has been illegally in this country for over six years and represented to the officials of this country that her entry as a temporary tourist visitor in early July 1968 was for a pleasure visit of two months.

B. By violating our immigration laws and advancing the technical arguments accepted by the majority, Bagamasbad has been able to take advantage of her illegal misrepresentations upon entry and her illegal overstay through litigation of contentions carefully considered and rejected repeatedly by administrative officials and the Board of Immigration Appeals.

C. It is most unlikely that any prejudice to petitioner would have resulted from her additional false representations and duplicity if she had returned to the Philippines and waited for the labor certification to become available in 1972.

D. Current releases by Commissioner of Immigration Leonard F. Chapman, Jr. estimate that there are eight million aliens illegally in the United States today.[4]

In order to understand the factual background of this case, in which the record shows careful review by the administrative officials of the petitioner's several applications for discretionary relief, it is significant that petitioner became deportable in 1969 for overstaying her 1968 temporary tourist visa for a pleasure visit to the United States, estimated by her to last two months. If she had complied with the law and her representations concerning her alleged, proposed, short visit to the United States by returning to the Philippines in that year, there would have been no findings of material false statements, including what her attorney describes as "concealed information; no question but what she misrepresented her status."[5] Instead of complying with the temporary 1968 visa granted pursuant to 8 U.S.C. § 1101(a)(15)(B) to petitioner as "an alien having a residence in a foreign country which [she] has no intention of abandoning and who is visiting the United States . . . temporarily for pleasure . . .," petitioner overstayed her permission to visit this country for several years and filed, in 1972 and thereafter, applications for adjustment of status under § 245 of the 1952 Immigration and Nationality Act (8 U.S.C. § 1255). These applications resulted in the findings of misrepresentations by petitioner which are exemplified by this language of the Administrative Law Judge's June 8, 1973, decision (A.R. 20–23):[6]

with her attorney, petitioner conceded that she signed the 1968 application for a temporary visa prepared by the second travel agency with which she dealt in order to secure permission to come to this country and gave the following sworn answer among others (A.R. 40):

"Q. Why did you apply for your visa through a travel agency?

"A. I tried to make contact with various hospitals in different states in the United States and received no answers. Then I tried with a first travel agency to get to the United States for education and training without success. This consumed about one year and a half. So I went to a second agency and explained that I wanted to go to the United States to further my education and training and ask them if they would help me."

The District Director denied the application for adjustment of status under 8 U.S.C. § 1255 on February 21, 1973, making a statement of reasons including this language (A.R. 35):

---

4. See November 6, 1975, release based on Report for Immigration Service by Lesko Associates, Washington, D.C., under L.E.A.A. grant to study impact of the illegal alien population on tax, health, welfare, and school systems, as well as on the labor market.

5. The argument presented by petitioner's attorney to the Board of Immigration Appeals included this language:

"Sticking out like a red flag before a red bull was the question of fraud, deceit, misrepresentation, before the consular officer abroad, at the time Miss Bagamasbad applied for her B–2 visa.

"There is no question but what she concealed information; no question but what she misrepresented her status."

See Administrative Record (A.R.) at 5.

6. These findings are supported by substantial evidence in the record. Also, at a personal appearance before an officer of the Immigration & Naturalization Service in January 1973

"Respondent, as noted above, previously had submitted her application for adjustment of status to the Immigration and Naturalization Service which had denied it on the ground that respondent had wilfully misrepresented a material fact when she had applied for her nonimmigrant visa at the American Consulate in Manila.

"In her sworn statement of January 26, 1973 (Ex. 2) respondent admitted that in applying for her nonimmigrant visa at the American Consulate at Manila, she stated she had no degree 'because that is what my agent advised me to do.' She admitted that he had informed her it would be difficult for her to get a visa to go to the United States if she stated she had a medical technology degree. During her deportation hearing on April 19, 1973 respondent admitted that she had not set forth her occupation as a teacher, again on advice of her travel agent, 'because he said it could be difficult to get the visa' (Tr. p. 6).

"It is pertinent to note that respondent testified that . . . she went to a travel agency for aid in getting to the United States 'for education and training,' without success. Hence she went to the second one for help and managed to secure her nonimmigrant visitor's visa on which is listed for the purpose of the trip 'Tourism—Pleasure trip for two months' (Ex. 3).

"Obviously, the whole pattern of respondent's behavior indicates clearly that she was fully aware that she was deliberately deceiving the American Consul when applying for her nonimmigrant visa by falsifying her amount of education, her occupation and even the purpose of her trip which she listed with tongue in cheek. Respondent has shown that her objective was to get to the United States for 'education and training' and she did not hesitate to use any means to accomplish it.

"Respondent was fully aware of her misleading representations but, as she stated, were she to tell the truth 'it could be difficult to get the visa' (Tr. p. 6). Obviously, such false statements were material, deliberate misrepresentations of respondent's true status and purpose.

"The extraordinary relief provided by Section 245 of the Immigration and Nationality Act should be granted only in meritorious cases. . . .

.   .   .   .   .

"Counsel argues that were respondent forced to seek her immigrant visa abroad, she would be unable to overcome the fraud factor of Section 212(a)(19) of the Act, supra. Such argument concerning consular action should be addressed to the Department of State—not here. We are concerned only with the facts before us. Were we to accord respondent the extraordinary relief requested, we would be placing a premium on falsehood and deceit and, in effect, encourage others to trod a similar path.

"The granting of adjustment of status is discretionary and is not automatic upon the establishment merely of statutory eligibility. . . .

"We find that the respondent has not sustained her burden of establishing that her application for adjustment of status

"You willfully misrepresented a material fact when you applied for your nonimmigrant visa. In a statement made before an officer of this Service on January 26, 1973, you admitted that at the time you applied for your nonimmigrant visa at the American Consulate in Manila, Philippines, you had not stated that you had received a degree whereas you had actually received a Bachelor of Science degree on January 4, 1966, from Centro Escolar University, Manila, Philippines. You also stated that you had done this on the advice of a travel agent who told you that it would be difficult to get a visa to go to the United States if you said you had a degree in medical technology. In view of these circumstances, favorable exercise of discretion is not warranted in your case . . . ..
[T]he favorable exercise of discretion is not warranted because the mere making of a misrepresentation by an alien to a United States consular officer abroad in obtaining a visa for entry into this country is an important element in the consideration of any subsequent application for adjustment of status under section 245 of the Immigration and Nationality Act, as amended."

merits the favorable exercise of discretion. Therefore, as a matter of administrative discretion her application will be denied. Although we shall deny the application for adjustment of status, we shall again, as a matter of discretion, grant her the lesser relief of voluntary departure. She has selected the Philippines as the country of deportation in the event that becomes necessary."

On appeal, the Board of Immigration Appeals concluded (A.R. 3): "The immigration judge's decision was correct."

This record makes clear that petitioner had ample opportunity to dispute the facts found by the administrative officials receiving her application for adjustment of status and, hence, she was not denied due process of law. See *Morrissey v. Brewer*, 408 U.S. 471, 486–89, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

The following language of the United States Court of Appeals for the Second Circuit in *Noel v. Chapman*, 508 F.2d 1023, 1027–29 (1975), is appropriate in this case:

"There is no reason to prefer those who have flouted the immigration laws, which permitted their entry for a limited time and purpose, over those who have steadfastly and patiently followed legal procedures."

The Supreme Court of the United States has consistently recognized the limited scope of judicial review of discretionary decisions by the Attorney General pursuant to congressional legislation in the immigration field. In *Hintopoulos v. Shaughnessy*, 353 U.S. 72, 77, 77 S.Ct. 618, 621, 1 L.Ed.2d 652 (1957), the Court said:

"It is clear from the record that the Board applied the correct legal standards in deciding whether petitioners met the statutory prerequisites for suspension of deportation. The Board found that petitioners met these standards and were eligible for relief. But the statute does not contemplate that all aliens who meet the minimum legal standards will be granted suspension. Suspension of deportation is a matter of discretion and of administrative grace, not mere eligibility; discretion must be exercised even though statutory prerequisites have been met."

More recently, the Supreme Court said in *Kleindienst v. Mandel*, 408 U.S. 753, 766–67, 92 S.Ct. 2576, 2583, 33 L.Ed.2d 683 (1972):

"The Court without exception has sustained Congress' 'plenary power to make rules for the admission of aliens and to exclude those who possess those characteristics which Congress has forbidden.' [Citing case.] '[O]ver no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens. [Citing case.] In *Lem Moon Sing v. United States*, 158 U.S. 538, 547, [15 S.Ct. 967, 39 L.Ed. 1082] (1895), the first Mr. Justice Harlan said:

'The power of Congress to exclude aliens altogether from the United States, or to prescribe the terms and conditions upon which they may come to this country, and to have its declared policy in that regard enforced exclusively through executive officers, without judicial intervention, is settled by our previous adjudications.'

"Mr. Justice Frankfurter ably articulated this history in *Galvan v. Press*, 347 U.S. 522, [74 S.Ct. 737, 98 L.Ed. 911] (1954), a deportation case, and we can do no better. After suggesting, at 530, [74 S.Ct. at 742], that 'much could be said for the view' that due process places some limitations on congressional power in this area 'were we writing on a clean slate,' he continued:

'But the slate is not clean. As to the extent of the power of Congress under review, there is not merely "a page of history" . . . but a whole volume. Policies pertaining to the entry of aliens and their right to remain here are peculiarly concerned with the political conduct of government. In the enforcement of these policies, the Executive Branch of the Government must respect the procedural safeguards of due process. . . . But that formulation of these policies is entrusted exclusively to Congress has become about as firmly embedded in the legislative

and judicial tissues of our body politic as any aspect of our government. . .

. . . . .

"We are not inclined in the present context to reconsider this line of cases."

The decisions which have emphasized that the appellate courts can review only refusal to exercise discretion by the administrative officials on the standard of abuse of discretion and need not review other administrative action which can become relevant only if discretion has been exercised seem persuasive in this situation. See, for example, *Goon Wing Wah v. Immigration & Naturalization Service*, 386 F.2d 292, 293–94 (1st Cir. 1967). Similarly, *Silva v. Carter, supra,* supports the action of the Board in this case in its holding that the Attorney General's denial of relief on a discretionary basis was within his power as granted by Congress.

*Foti v. Immigration Service*, 375 U.S. 217, 84 S.Ct. 306, 11 L.Ed.2d 281 (1963), seems to me more consistent with the result reached by the Board than that of the majority opinion. In that case, the Court said at 228, 84 S.Ct. at 313:

"Admittedly, the standard of review applicable to denials of discretionary relief cannot be the same as that for adjudications of deportability, since judicial review of the former is concededly limited to determinations of whether there has

been any abuse of administrative discretion."

Furthermore, the Court emphasized that the intent of Congress in enacting § 5a of P.L. 87–301, adding 8 U.S.C. § 1105a to the Immigration and Nationality Act, "was to prevent delays in the deportation process" (375 U.S. 232, 84 S.Ct. 315). Such delays will result from the additional administrative burden required by the majority's mandate that eligibility for deportation be the subject of findings in every application under 8 U.S.C. § 1255. Reliance on *Jay v. Boyd*, 351 U.S. 345, 76 S.Ct. 919, 100 L.Ed. 1242 (1956), by the majority would appear to be misplaced. The regulations applicable in 1956 to requests for adjustment of status, which require "a discussion of the evidence relating to the alien's eligibility for such relief. . . ." [7] were not in effect in 1972. In addition, the application in *Jay* was based on language in § 244 (not 245) of the 1952 Immigration and Nationality Act,[8] which was far different in 1956 than the wording in § 245 [9] was in 1972.[10]

Since the Supreme Court has emphasized its concern with adding burdens to "the efficient operation of the lower federal courts," *Swift & Co. v. Wickham*, 382 U.S. 111, 128–29, 86 S.Ct. 258, 268, 15 L.Ed.2d 194 (1969); *cf. Gonzalez v. Employees Credit Union*, 419 U.S. 90, 98, 95 S.Ct. 289, 42 L.Ed.2d 249 (1974); *Rosado v. Wyman*, 397 U.S. 397, 403, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970),[11] we should not be insensitive to the

7. 8 C.F.R. (Rev. 1952) 242.61(a); see also 8 C.F.R. (Rev. 1952) 242.53(i).

8. 8 U.S.C. § 1254.

9. 8 U.S.C. § 1255.

10. For example, 8 U.S.C. § 1254 requires reports to Congress on action taken by the Attorney General to adjust the status of aliens under that section, whereas such reports were not required in 1972 when there was an adjustment of status under 8 U.S.C. § 1255, indicating a congressional desire for more detailed findings where applications were made under 8 U.S.C. § 1254.

11. The Chief Justice of the United States has pointed out that the impact of legislation and court decisions should be carefully considered by those prescribing such legal rules. See *The State of the Judiciary—1975*, by Chief Justice

Burger, 61 A.B.A.J. 439 (1975); *The State of the Judiciary—1972*, by Chief Justice Burger, 58 A.B.A.J. 1049, 1050 (1972). In 58 A.B.A.J. at 1050, the Chief Justice said:

"In recent years Congress has required every executive agency to prepare an 'environmental impact statement' whenever a new highway, a new bridge or other federally funded projects are planned. I suggested, with all deference, that every piece of legislation creating new cases be accompanied by a 'court impact statement,' prepared by the reporting committee and submitted to the judiciary committees of the Congress with an estimate of how many more judges and supporting personnel will be needed to handle the new cases.

"This is not to suggest that Congress reject legislation simply because it would increase litigation in the federal courts, but only to suggest that Congress consider the needs of

imposition by our decisions of additional requirements on administrative agencies burdened with applications for relief from large numbers of aliens illegally in this country. See page 120 and note 4 above.[12]

ADAMS and ROSENN, Circuit Judges, join in this opinion.

the courts along with the need for new legislation. What we sadly lack at the present time is the ability to plan rationally for the future with regard to the burdens of the courts. It is essential that we do this if our courts are ever to function as they should." Again, in 61 A.B.A.J. at 439, this language appears:

"Various enactments of Congress and decisions of the courts have sought to make more certain that justice will be administered in an even-handed way and that there will be faithful compliance with the statutes and constitutional provisions for the protection of the rights of accused persons.

"These developments have occurred in a period of rising crime and of mounting public concern over crime. Taken together, these factors have materially increased the burdens on the federal courts, and not all aspects of those added burdens are readily apparent."

12. A December 8, 1975, release by Commissioner Chapman (see note 4 above) includes, *inter alia*, this language:

"Commissioner Leonard F. Chapman, Jr., said the cost to the United States of the illegal alien problem may run as high as $16 billion a year, and is increasing by $500 million each year. The cost figures as based upon findings in a policy analysis done for the Immigration Service by Richard G. Darman, a former Deputy Assistant Secretary of the Department of Health, Education and Welfare and currently a principal in ICA, Incorporated, a Washington, D.C., firm which specializes in public policy development. The ICS analysis states that for every one million adult illegal aliens in the United States there is a presumable next tax burden of roughly $2 billion. The analysis also states that the number of illegal aliens is conservatively estimated to be increasing by about 250,000 per year or more adding at least $500 million yearly to the tax burden. INS believes the number is increasing by more than 250,000 a year. An earlier study done for INS by Leska Associates, Inc., estimated the number of illegal aliens in the nation at 8 million. At least 80 percent or more are adult. Indicating an annual tax burden of $13 billion or higher."