Giuseppe GIAMBANCO, Petitioner,

v.

IMMIGRATION AND NATURALIZATION SERVICE.

No. 75–1401.

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit Rule 12(6) Oct. 29, 1975.

Decided Feb. 25, 1976.

As Amended April 14, 1976.

As Amended May 14 and June 10, 1976.

Rehearing En Banc Denied July 9, 1976.

James J. Orlow, Wasserman, Orlow, Kaye & Rubin, Philadelphia, Pa., for petitioner.

B. Franklin Taylor, James P. Morris, Chester J. Halicki, John L. Murphy, Dept. of Justice, Washington, D. C., Michael B. L. Hepps, Asst. U. S. Atty., Philadelphia, Pa., for respondent.

Before GIBBONS, BIGGS and WEIS, Circuit Judges.

## OPINION OF THE COURT

BIGGS, Circuit Judge.

This is a petition for review of an order from the Board of Immigration Appeal's refusal to overturn an immigration judge's denial of Giambanco's petition for adjustment of status and waiver of a ground of excludability under the Immigration and Nationality Act of 1952. Giambanco bases his claim on his marriage to a United States citizen and requests permanent resident status on the strength of his wife's relative-immigrant visa petition. In addition, Giambanco has filed a motion of remand in this court to allow the Board of Immigration Appeals to consider the birth of a citizen child to Giambanco and his citizen wife subsequent to the Board's finding. This Court has jurisdiction under 8 U.S.C. § 1105a.

## FACTS

Giambanco, an Italian citizen, entered this country on November 11, 1969, under a visitor for pleasure visa. He was authorized to stay until November 1, 1970. He overstayed and on April 26, 1971, admitted deportability before a special inquiry officer. He was given a month within which to voluntarily depart. Giambanco failed to depart by that time and on May 20, 1971, entered into a marriage with a United States citizen that was subsequently found to be designed to defraud the United States to obtain a permanent residence visa, 18 U.S.C. § 371. As a result of the fraud conviction, Giambanco received a suspended sentence and two years probation. Sentencing took place on February 12, 1974. At that time the trial judge recommended pursuant to section 241(b)(2), 8 U.S.C. § 1251(b)(2), of the Immigration and Nationality Act of 1952 (INA) and 8 CFR

§ 241, that Giambanco's conviction not be the cause of deportation under section 241(a)(4), 8 U.S.C. § 1251(a)(4).

His first marriage ended on August 20, 1973, and, after approximately two weeks, Giambanco married the daughter of one of his co-conspirators in the fraud. On the basis of his wife's citizenship, Giambanco petitioned to reopen his deportation hearing. He sought an adjustment of status to that of a permanent resident under INA section 245, 8 U.S.C. § 1255, and waiver of a ground of excludability under INA section 212(h), 8 U.S.C. § 1182(h), controlling 8 U.S.C. § 1182(a)(9), which provides for exclusion of aliens who have been convicted of certain crimes of moral turpitude. The hearing was reopened and the immigration judge denied the adjustment. Giambanco's timely petition for review to the Board of Immigration Appeals was dismissed on April 8, 1975. Subsequent to the filing of this appeal, Giambanco made a motion to remand on the basis of the birth to him and his citizen wife of a child. The government has responded by submitting a brief in opposition. This court has dispensed with oral argument proceeding under our Rule 12(6)(a).

## LAW

This action presents two questions of law. First, does the Administrative Procedure Act of 1966 (APA), 5 U.S.C. § 500 *et seq.*, preclude from sitting as a member of the Board an attorney, who was employed by the Service's general counsel at the time of the case's oral argument before the Board, but was in nowise involved with the case? Second, does the trial judge's recommendation under INA section 241(b)(2) that Giambanco not be deported because of his fraud conviction prevent discretionary consideration of the conviction by the Board in an adjustment of status proceeding under INA section 245?

## I.

Giambanco argues that the presence of the two former attorneys in the office of the Immigration Service's General Counsel, Irving Appleman, Esq., and David Milhollan, Esq., on the Board violated his right to due process of law under the Fifth Amendment. Further, in his reply brief, Giambanco raises for the first time, a possible violation of section 5 of the APA, 5 U.S.C. § 554(d). It is undisputed that Appleman at the time of oral argument was the supervisor of the attorney who argued the case, Paul Vincent, Esq. At the very least, Giambanco contends there is an appearance of conflict of interest.

In response, the government has filed with its brief affidavits from Appleman, Milhollan and Vincent. Both Appleman and Milhollan aver that they had no connection with the case prior to becoming Board members and that they were not influenced by Vincent's involvement in the case. Milhollan goes further and states that there was no discussion of the case in conference after he became a member of the Board. Presumably, he and Appleman voted solely on the basis of the record. There is no indication whether they listened to a recording of or read the oral argument after becoming members of the Board. The Board's vote on the Giambanco dismissal was unanimous.

The issue is presented whether the APA's section 5 requirement of separation of adjudicative and prosecutorial functions, 5 U.S.C. § 554(d), applies to a proceeding to consider a petition to adjust status under section 245 of the INA, 8 U.S.C. § 1255, and to waive a ground of excludability under section 212(h), 8 U.S.C. § 1182(h). Under the former provision the Attorney General has the discretion to grant an alien permanent resident status if certain statutory conditions are met. Under the latter the Attorney General may waive exclusion of those with certain criminal backgrounds or with citizen children, on a proper showing.

Various discretionary authorities of the Attorney General under the INA have been found limited by the requirements of the

APA.[1] Here, the Board of Immigration Appeals declined to overturn the immigration judge's refusal to revoke Giambanco's deportation order. Under *Marcello v. Bonds*, 349 U.S. 302, 75 S.Ct. 757, 99 L.Ed. 1107 (1955), the hearing procedures of the immigration judge are not subject to the APA. The question here is whether the Board, which sits in review of these determinations and is established at the discretion of the Attorney General, 8 U.S.C. § 1252(b), is also exempt from APA requirements. We think it is, for it would be anomalous to find that the initial immigration hearing was exempt, only to say that the review of such hearing was not exempt. To so hold would interject needless complexity into what is designed to be a discretionary process[2] and require different standards for separation of adjudicative and prosecutorial functions for the immigration judges and the Board members.[3]

Complexity problems aside, this result is compelled by the language of section 242 itself. The Board has been established at the Attorney General's discretion to implement the statutory requirements of deportation and exclusion under the INA. Subsection (b)(4) requires that the Attorney General assure by regulation that all deportations be made on grounds of "reasonable substantial and probative evidence". The Attorney General is to see under subsection (c) that deportation is carried out in a proper manner after the final order "under administrative processes is made." On these matters the Attorney General's determinations are to be administratively final.[4]

To carry out these section 242 duties, as well as his exclusion obligations, the Attorney General has established the Board under 8 CFR § 3.1. In reviewing the findings of the immigration judge, the Board acts as the Attorney General's surrogate to insure that the rights and privileges of the alien are protected and that deportation is undertaken only on the basis of sufficient evidence. The Board has been made by the Attorney General a central part of his implementation of section 242. Thus the exclusive procedure language of section 242 should apply to exempt the Board from the APA under *Marcello*. When the Board is asked to adjust a hearing determination under section 245 or waive a ground of excludability under section 212(h), it is acting as an integral part of the exempt section 242 procedure. The Board was in existence at the time of the passage of the INA and there is no indication that it was not intended by Congress to operate in conjunction with the exempt specialized hearing procedures of section 242.[5] To find the

1. *Shaughnessy v. Pedreiro*, 349 U.S. 48, 75 S.Ct. 591, 99 L.Ed. 868 (1955) (Prior to its 1966 APA amendment, section 10 of the Act was applicable to limit "the final order" language of section 242(b) of the INA.)

   *Noel v. Chapman*, 508 F.2d 1023, 1029–31 (2d Cir. 1975), *cert. denied*, 423 U.S. 824, 96 S.Ct. 37, 46 L.Ed.2d 40, 44 U.S.L.W. 3201 (1975) (Regulation under section 244 of the INA, allowing the Attorney General discretionary authority to extend voluntary departure would be required to conform to section 4 of the APA if it were not a general policy guideline.)

   *Blackwell Coll. of Bus. v. Attorney Gen.*, 147 U.S.App.D.C. 85, 454 F.2d 928, 934 (1971) (Section 9 of the APA is applicable to a license revocation proceeding under section 101(a)(15) of the INA) *Xytex Corp. v. Schliemann*, 382 F.Supp. 50, 52 (D.Colo.1974) (Standards of limited judicial review under section 10(e) of the APA applicable to further certification under section 212(a)(14) of the INA.)

2. We note the Supreme Court's recent policy discussion in *Withrow v. Larkin*, 421 U.S. 35, 49–50, 95 S.Ct. 1456, 1465, 43 L.Ed. 712, 725 (1975): "[R]ecently we have sustained against due process objection a system in which a Social Security examiner has responsibility for developing the facts and making a decision as to disability claims, *and observed that the challenge to this combination of functions 'assumes too much and would bring down too many procedures designed, and working well, for a government structure of great and growing complexity.'*" (citation omitted).

3. Since the immigration hearing is exempt under *Marcello, supra,* from APA section 5, it presumably would be subject to the more lenient due process standard. *See Larkin, supra* note 2, at 52, 95 S.Ct. 1456.

4. Subject to the judicial review under 8 U.S.C. § 1105a.

5. *See* H.R.Rep. No. 1365, 82d Cong., 2d Sess. (1952), *reproduced,* 1952 U.S. Code Cong. & Admin. News, pp. 1653, 1687–88 (committee analysis of INA).

Board non-exempt would be to hypothesize a disjointed congressional intent that makes no appearance in the legislative history of the 1952 Act.[6]

■ Accordingly, we hold that the APA has no relevance to Board review of dismissals of the section 245 and 212(h) claims here.[7]

## II.

However, the second question of law presents a difficult problem. When Congress has explicitly removed a factor as a basis for deportation, can that factor ever be used by the Attorney General under section 245 to deny discretionary relief?

This question is of first impression in this circuit. In this Court's *en banc* decision in *Ameeriar v. Immigration and Naturalization Service*, 438 F.2d 1028 (3d Cir. 1971), *cert. dismissed*, 404 U.S. 801, 92 S.Ct. 21, 30 L.Ed.2d 34 (1972), a close variation of the issue was implicitly raised, but not expressly addressed. There the petitioner attempted to reopen his section 242 deportation determination by seeking section 245 adjustment of status. The court was required to interpret a 1960 amendment to section 245, Act of July 14, 1960, Pub. L. No. 86–848, § 10, 74 Stat. 505, *amending* 8 U.S.C. § 1255. That amendment removed the eli-gibility requirement that the alien enter the United States as a bona fide nonimmigrant. Judge Gibbons was not able to convince a majority of this Court that the legislative history of this amendment removed from the Attorney General's discretionary consideration the intent of the immigrant to stay permanently, as opposed to the intent to circumvent immigrant quotas. *Id.* at 1032, 1037–39. The issue turned on whether the amendment went so far as to exclude those with the first intent referenced. This Court found both intents relevant in the exercise of the Attorney General's discretion. Implicit in both the *en banc* majority and dissent reasoning was the premise that, if the amendment had worked to exclude from consideration the intent found, there would arise a restraint of the Attorney General's discretion under that section. There we faced the problem of limiting discretion under a section 245 amendment; here we have the problem of whether that discretion is limited by other provisions in the INA. On the basis of legislative history and judicial policy considerations, does section 241(b)(2) act as an effective restraint on section 245 discretion?

It is clear from the opinion of the immigration judge that Giambanco's fraud conviction was a factor, if not the only factor

6. The Supreme Court's decision in *Shaughnessy v. United States ex rel. Accardi*, 349 U.S. 280, 75 S.Ct. 746, 99 L.Ed. 1074 (1955), lends implicitly some support to this view. There, in a section 19(c) suspension-of-deportation hearing under the Immigration Act of 1917, the Court decided a mixed adjudication-prosecution issue without reference to application of the APA to the Board.

There is also the issue whether sections 7(a) and 12 of the APA, 5 U.S.C. §§ 556, 559, compel a contrary result. Section 7(a) exempts from the APA "classes of proceedings, in whole or in part, by or before boards or other employees specially provided for by or designated under statute . . . ." Our finding here is that Board review under the INA is an extension of the proceeding specially provided for under INA section 242; therefore, in our view, the exemption should apply.

APA section 12 provides in part that a "[s]ubsequent statute may not be held to supersede or modify this subchapter . . . except to the extent that it does so expressly." *Marcello* held, in effect, that supersession could be implied from the detailed and specialized provisions in section 242. We have extended this supersession to the Board because we consider it an integral part of those section 242 procedures. *Marcello* and *Accardi, supra*, came eleven years prior to the 1966 amendment and codification of the APA. If both ignored congressional intent, Congress did nothing to rectify the situation in 1966. As the dissent points out Congress has been quick to act in the past when it disagrees with the Court's application of the APA in the immigration area. *See* discussion of *Wong Yang Sung v. McGrath*, 339 U.S. 33, 70 S.Ct. 445, 94 L.Ed. 616 (1950) in dissent, *infra*.

7. We have no occasion to decide the issue whether Board review of section 204 and section 212 exclusion determinations, independent of section 242, is covered by the APA.

As to Giambanco's constitutional claim, we think *Withrow v. Larkin, supra*, 421 U.S. at 46–55, 95 S.Ct. 1456, is dispositive, especially since it has not been established that Milhollan or Appleman participated in the Service's investigation.

relied on to deny him discretionary relief under section 245.[8] The immigration judge found that the relief of section 245 was "*discretionary* and . . . not automatic upon the establishment merely of statutory eligibility. There must be outstanding equities in a meritorious case to warrant it. . . . " Administrative Record, pp. 38–39 (emphasis in the original).

The Attorney General as promulgated no regulations to aid the immigration judge's exercise of discretion when sections 241(b)(2) and 245 are jointly applicable.[9] The Immigration and Naturalization Service has ruled that section 241(b) applies to both exclusion and deportation proceedings.[10] Generally, discretion under the INA can only be exercised after the statutory prerequisites have been satisfied.[11] The INA House Report is silent as to section 241(b)(2)'s effect on an adjustment of status determination,[12] nor does the legislative history of section 245 add any

---

8. The relevant portion of the immigration judge's opinion reads "What do we find in this case? Respondent is the spouse of a United States citizen. He has not been in the United States for a very long period of time (and most of such stay has been in an illegal status); he has been married for a comparatively short period of time—and his wife was aware of his legal difficulties when she married him. He is purchasing a pizzeria—with full knowledge of the fact that he is in the United States illegally and that he has been prosecuted and convicted of conspiracy to defraud the United States for originally having entered into a fraudulent marriage in order to stay on in the United States. Considering the entire record, the entire picture presented, we do not find such outstanding equities such great merit in this case as to warrant the favorable exercise of discretion on his behalf so as to adjust his status to that of a permanent resident." Ad. Rec., p. 39.

9. See 8 CFR §§ 241.1, 245.

10. *Matter of K——,* 9 I. & N. Dec. 121 (Bd. of Imm. App. 1960).

11. *Foti v. Immigration Serv.,* 375 U.S. 217, 228–29 n. 15, 84 S.Ct. 306, 313, 11 L.Ed.2d 281, 290 (1963) ("Since a special inquiry officer cannot exercise his discretion to suspend deportation until he finds the alien statutorily eligible for suspension, a finding of eligibility and an exercise of (or refusal to exercise) discretion may properly be considered as distinct and separate matters."); *Jay v. Boyd,* 351 U.S. 345, 353, 76 S.Ct. 919, 924, 100 L.Ed. 1242 (1956) ("Eligibility for relief [under INA section 244] . . . is governed by specific statutory standards which provide a right to a ruling on an applicant's eligibility."); *Bagamasbad v. Immigration & Nat. Serv.,* 531 F.2d 111 (3d Cir. 1976) (*en banc*) ("We conclude that the statutory schema of § 245 requires a determination of eligibility as a prerequisite to any exercise of discretion by the Attorney General so that an alien, physically present in the United States could avail himself of administrative and judicial review."). *See* discussion of *Ameeriar, supra.*

12. Section 241(b) is not even mentioned in the Report's analysis of the 1952 Act. H.R.Rep. No. 1365, 82d Cong., 2d Sess. (1952), *reproduced,* 1952, U.S. Code Cong. & Admin. News pp. 1653, 1687–88 (committee analysis of INA). This is perhaps because the provision was brought forward from the Immigration Act of 1917.

The language of section 19 of the Immigration Act of 1917 is similar to that of section 241(b)(2) of the INA. Section 19 contains the proviso, that, in the case of an alien committing a crime of moral turpitude, "deportation [shall not] be made or directed if the court, or judge thereof, sentencing such alien for such crime shall . . . [at the time of sentencing], due notice having first been given to representatives of the State, make a *recommendation* to the Secretary of Labor that such alien shall not be deported in pursuance of this Act . . ." Act of Feb. 5, 1917, Ch. 29, § 19, 39 Stat. 889.

There is only one legislative report on section 19, that of the Senate. It notes that the recommendation proviso was added on the floor of the House, "the obvious purpose of which" was to allow the court to recommend "that deportation be not effected after the sentence has been served." S.Rep. No. 352, 64th Cong., 1st Sess., 15 (1916). The House debate at the time of amendment of section 19 was chiefly concerned with assuring that the trial judge have all the facts and viewpoints fresh in his mind when he made the recommendation. 53 Cong. Rec. 5171 (1916). To assure this freshness the thirty-day time limit was inserted. *Thus the law assures that the judge is well informed at the time of recommendation.*

*The recommendation in the debates was treated as forbidding all deportation, without recognizing the discretionary-nondiscretionary use distinction.* "The bill as framed says at the time of imposing judgment or passing sentence the judge, if he makes a recommendation to the Secretary of Labor that the man should not be deported, *he will not be.*" 53 Cong. Rec. 5171 (1916) (remarks of Rep. Powers) (emphasis supplied). The sponsor of the amendment used the phrase "obliterate deportation" when referring to the effect of the recommendation. *Id.*

enlightenment.[13] However, both the express language of section 241(b)(2) and the Service's treatment of the closely-related "expungement"[14] cases elucidate the policy grounds upon which the applications of sections 241(b)(2) and 245 can be rationalized.

### A.

Under the relevant portion of section 241(a)(4), an alien is to be deported if he or she is "convicted of a crime involving moral turpitude committed within five years after entry and either sentenced to confinement or confined therefor in a prison or corrective institution, for a year or more . . . ." Section 241(b)(2) makes this section inapplicable "if the court sentencing such alien for such crime shall make, at the time of first imposing judgment or passing sentence, or within thirty days thereafter, a recommendation to the Attorney General that such alien not be deported, *due notice having been given prior to making such recommendation to representatives of the interested State, the Service, and prosecution authorities, who shall be granted an opportunity to make representations in the matter.*" (emphasis supplied).

Here, the judge at the fraud trial, Judge Gorbey, certified that the Service was represented at the time of his recommendation.[15] Judge Gorbey made the determination, as a matter of judicial discretion, that, based upon all the facts leading to the conviction, that this conviction should not be a basis for deportation. The Service argues that it should be free at its discretion to effectively overturn that recommendation, although (1) its proceeding was far more procedurally informal than the trial over which Judge Gorbey presided; and (2) the Service's inquiry in its proceeding ranged perforce far beyond the facts leading to the conviction, making the Service less able to weigh the conviction facts as thoroughly.[16] Thus Judge Gorbey was more able to ascertain the extent of moral turpitude involved in this conviction. Also he had the benefit of the Service's expertise and experience.

On these grounds we feel that Judge Gorbey's discretionary determination should supersede that of the Service. To hold otherwise would make meaningless section 241(b)(2)'s requirement that the Service be represented before the trial judge; for the Service would have no incentive to make a showing, if as a matter of discretion, in a later proceeding under its control it could effectively overturn the trial judge's determination.

### B.

Further, the Service's own treatment of the closely-related conviction expungement cases supports this result. Here, the Service argues that while section 241(b)(2) prevents the use of the fraud conviction as the *sole* basis for deportation, the Service can take it into account as a factor in its discretionary adjustment of status determination. However, the Service itself has held under section 241(a)(4) that state law expungement of alien convictions removes the use of convictions as a basis for deportation, with no hint of a discretionary use excep-

at 5169. *See also id.* at 5169–5170 (remarks of Reps. Burnett and Bennett).

**13.** *See Ameeriar v. Immigration & Nat. Serv.,* 438 F.2d 1028, 1036–38 (3d Cir. 1971) (Gibbons, J., dissenting), *cert. dismissed,* 404 U.S. 801, 92 S.Ct. 21, 30 L.Ed.2d 34 (1972) (thorough discussion of section 245 legislative history and subsequent amendment).

**14.** We use the term here, as does the Service, as the act of wiping the convicted's record

clean of the conviction. *See* cases cited notes 17–20 *infra.*

**15.** Ad. Rec. p. 88. It has been held sufficient to vitiate the effectiveness of such judicial recommendation that the Service was not given timely notice. *United States ex rel. Piperkoff v. Esperdy,* 267 F.2d 72, 74 (2d Cir. 1959). *See also* Appleman, *The Recommendation Against Deportation,* 58 *A.B.A.J.* 1294, 1295 (1972).

**16.** *See* note 12 *supra* at ¶ 3.

tion.[17] Nor does this exception appear in the expungement cases involving narcotics, where Congress has mandated an especially stern deportation rule.[18] The Service expungement policy of no deportation with no apparent discretion is long standing. It is in keeping with the Service's perception that under 241(a)(4) Congress has "progressively alleviated the rigor of the laws relating to convicted aliens. . . ."[19] Further, under federal circuit review of this Service policy, the discretionary use exception has also failed to appear.[20]

We review the federal and state expungement precedent because the same consideration control the effect of section 241(b)(2) judicial recommendation. Both suggest the conclusion that the alien is not to be punished further by deportation. As the Supreme Court noted with respect to the predecessor of section 241(a)(4):

> We resolve the doubts in favor of [the alien] because deportation is a drastic measure and at times the equivalent of banishment or exile, *Delgadillo v. Carmichael*, 332 U.S. 388. It is the forfeiture for misconduct of a residence in this country. Such a forfeiture is a penalty. To construe this statutory provision less generously to the alien might find support in logic. But since the stakes are considerable for the individual, we will not assume that Congress meant to trench on his freedom beyond that which is required by the narrowest of several possible meanings of the words used.

*Fong Haw Tan v. Phelan*, 333 U.S. 6, 10, 68 S.Ct. 374, 376, 92 L.Ed. 433, 436 (1948). A judicial recommendation of no deportation, like the federally or state mandated expungement, on its face is designed to prevent the levy of additional penalties over and above that which the original court found appropriate.[21] Here, given the nature of Giambanco's fraud, Judge Gorbey awarded a two-year suspended sentence. To say that this penalty is now to be augmented by a penalty of banishment, despite

17. *Matter of Nagy*, 12 I. & N. Dec. 623 (Bd. of Imm. App. 1968) was interpreted in *Mestre Morera v. Immigration & Nat. Serv.*, 462 F.2d 1030, 1032 (1st Cir. 1972), as standing for the proposition that "an alien whose conviction for a 'crime involving moral turpitude' had been expunged . . . [under the Youth Corrections Act] *could not be deported* under section 241(a)(4)." (emphasis supplied). *See* note 20 *infra*.

18. *Morera v. Immigration & Nat. Serv.*, 462 F.2d 1030 (1st Cir. 1972) (countervailing "second chance" policy of Youth Corrections Act controlling).

19. *Matter of G___*, 9 I. & N. Dec. 159, 164 (Bd. of Imm. App. 1960), *aff'd by Atty. Gen.*, 9 I. & N. Dec. 165 (1961) (The distinction between discretionary-nondiscretionary use of a conviction was not raised in the course of discussion of conviction's weight in deliberations leading to original deportation order.).

20. The First Circuit in *Mestre Morera v. Immigration & Nat. Serv.*, 462 F.2d 1030 (1st Cir. 1972) held that expungement under the Federal Youth Corrections Act, 18 U.S.C. § 5021(a), was sufficient to prevent deportation under section 241(a)(4). In *Garcia-Gonzales v. Immigration & Nat. Serv.*, 344 F.2d 804, 810 (9th Cir. 1965), *cert. denied*, 382 U.S. 840, 86 S.Ct. 88, 15 L.Ed.2d 81 (1965), the Ninth Circuit noted "[w]e are aware that the Immigration and Naturalization Service has long held that a convict-

ed person who has [received the benefit from expungement under California law] . . . *cannot be deported* under [section 241(a)(4)] of the Act." (citations omitted; emphasis supplied). In *Chlomos v. Immigration & Nat. Serv.*, 516 F.2d 310, 314 n. 6 (3d Cir. 1975) (Weis, J.), the expungement issue was raised but not decided. In the First and Ninth Circuit cases the discretion-nondiscretion distinction was not raised. In *Mestre Morera*, the expungement claim was raised during the original deportation hearing. *Mestre Morera* argued that no final deportation order could be made because of the possibility of future expungement of the conviction. Such expungement occurred after Board's decision and before the decision of the circuit court. The circuit court refused to remand on the grounds that Morera's contention presented a question only of law. 462 F.2d at 1031. In *Garcia-Gonzales* the expungement issue was raised as the basis for a motion to reopen the deportation hearing. *Presumably the conviction was considered as a matter of discretion by the Board in its decision on reopening. In a discussion of section 241(a) (4), the circuit court implies, on the basis of Service precedent, that the Service would not allow use of the alien conviction in the decision whether or not to deport, where the alien has actually received the benefits of state expungement law.*

21. *See* note 12 *supra*.

the recommendation of Judge Gorbey, would be unjust. A joint reading of sections 241(b)(2) and 245 based upon a novel nondiscretionary-discretionary use distinction would produce a very harsh result indeed. We cannot accept the government's craftily myopic argument that section 241(b)(2) in no way limits those factors that can be considered at the discretion of the Service under section 245.

Accordingly, in order (1) to maintain the integrity of the deportation recommendation of the trial judge; (2) to have the discretionary determination made by the actor best able to make it; and (3) to avoid a possibly unjust penalization of aliens such as Giambanco, we hold that the Service cannot take into account as a matter of discretion under section 245 Giambanco's prior fraud conviction in determining whether he is entitled to adjustment of deportation status.

Since this question is one of first impression in this circuit, this Court will not remand as Giambanco requested without going, as we have seen, to this issue, even though the birth of a citizen child after the Board's findings may be of some relevance to adjustment of status. However, the pri-

or fraud conviction issue needed to be resolved as a matter of law before any new proceeding went forward. We will reverse and remand this case to the Board for further determination consistent with this opinion and expressly direct the Board to consider the birth of Giambanco's citizen child as a factor in its deliberations.[22]

GIBBONS, Circuit Judge (dissenting).

Although the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* (hereinafter APA), has been in effect since 1946, and the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.* (hereinafter INA), since 1952, new issues occasionally arise concerning their interrelationship. The two cases *sub judice* squarely confront this court with an issue of first impression: does the mandatory disqualification provision of § 5(c) of the APA, 5 U.S.C. § 554(d),[1] govern the review by the Board of Immigration Appeals (hereinafter BIA) of decisions of an immigration judge, specifically those denying adjustment of status, a request for a waiver of a ground of excludability and a petition for suspension of deportation under §§ 245, 212(h) and 243(h) respectively of the INA, 8

---

22. We note, without deciding, that section 241(f) may be some evidence of Congressional sentiment on this matter. That section reads:

> The provisions of [section 241] relating to the deportation of aliens within the United States on the ground that they were excludable at the time of entry as aliens who have sought to procure, or have procured visas or other documentation, or entry into the United States by fraud or misrepresentation shall not apply to an alien otherwise admissible at the time of entry who is the spouse, parent, or child of a United States citizen or of an alien lawfully admitted for permanent residence.

After entry on a visitor for pleasure visa, Giambanco attempted to secure a permanent visa by fraud. If this is construed as "entry," a matter we do not decide, this provision may have some relevance. Of course, our decision here has held that the Giambanco conviction cannot be considered by the Board in subsequent deliberations. However, the provision is some evidence that Congress would consider the birth of Giambanco's citizen child a strong factor in his favor in the subsequent balancing of the adjustment of status equities, if "entry" is involved. Even if fraud is present, Congress

has indicated that the birth of a citizen child is entitled to strong weight.

It is possible that this section 241(f) policy is not relevant, as evidence of Congressional guidance, because there was no "entry" at the time of the fraud. *See Candido Pereira-Barreira v. Immigration & Nat. Serv.*, 523 F.2d 503 (2d Cir. 1975).

We make no determination on this matter.

1. An employee or agent engaged in the performance of investigative or prosecuting functions for an agency in a case may not, in that or a factually related case, participate or advise in the decision, recommended decision, or *agency review* pursuant to section 557 of this title, except as witness or counsel in public proceedings. This subsection does not apply—

> (A) in determining applications for initial licenses;
> (B) to proceedings involving the validity or application of rates, facilities, or practices of public utilities or carriers; or
> (C) to the agency or a member or members of the body comprising the agency. (emphasis added).

U.S.C. §§ 1255, 1182(h), 1253(h)?[2] If the APA applies, we must reverse because the affidavits submitted by the Board members[3] who were employed as counsel for the Immigration and Naturalization Service (hereinafter INS) at the date of oral argument do not, as § 5(c) requires, deny participation or advice in a "factually related case."[4] If it does not, we should, as the majority holds, affirm the Board's decision on the ground that procedural due process was not violated by the mere combination of such agency functions as prosecution and adjudication in the same Board members. *See, e. g., Withrow v. Larkin*, 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975); *Marcello v. Bonds*, 349 U.S. 302, 75 S.Ct. 757, 99 L.Ed. 1107 (1955); *Shaughnessy v. United States ex rel. Accardi*, 349 U.S. 280, 75 S.Ct. 746, 99 L.Ed. 1074 (1955).

I conclude that § 5(c) of the APA governs these proceedings before the BIA. In my view the majority opinion ignores the Supreme Court's reasoning in *Marcello v. Bonds* in extending the exemption of deportation hearings from coverage by the APA to administrative review of those hearings by the BIA. By so holding the majority ignores as well an express congressional pronouncement and sound policy reasons in favor of APA coverage.

### I

In order to determine whether or not the procedural requirements of the APA govern BIA proceedings, a brief review of the interrelationship between that statute and the INA is in order. Until 1950 it was generally thought, and with good reason, that deportation hearings were exempt

**2.** It is clear that the decision of the BIA is a "final disposition" within the meaning of "order" and "adjudication" as defined by 5 U.S.C. § 551(6), (7). *See Foti v. Immigration & Nat. Serv.*, 375 U.S. 217, 84 S.Ct. 306, 11 L.Ed.2d 281 (1963). Thus the cases *sub judice* are easily distinguishable from *ITT v. Electrical Workers*, 419 U.S. 428, 95 S.Ct. 600, 42 L.Ed.2d 558 (1975), where the Supreme Court held that § 5(c) of the APA did not govern proceedings conducted under § 10(k) of the National Labor Relations Act, 29 U.S.C. § 160(k).

**3.** In *Giambanco v. INS,* Chairman Milhollan and Member Appleman swore that they did not participate in any way in the case against petitioner, that they had no knowledge of the case prior to becoming members of the Board, and that they were not influenced by the fact that they knew the attorney arguing the case. (Exhibits A and B in the Addendum of Respondent's Brief.)

In *Cisternas-Estay v. INS,* however, the affidavits indicate, contrary to petitioner's argument, that Member Appleman who had argued the case before the Board, disqualified himself and, therefore, did not, participate in the decision. Chairman Milhollan made the same representations as he had in his affidavit in Giambanco. Therefore, this case must also be remanded to the Board in order to ascertain whether or not Milhollan had been involved in a "factually related case."

In both cases, I do not think that the fact that the members in question swear that they "had no knowledge of the case" prior to their elevation to the Board is sufficiently clear to warrant a conclusion that there was no involvement in a "factually related case." The Government wants to leave the issue of disqualification to the discretion of the member himself. Certainly a member of the Board may disqualify himself pursuant to § 7(a) of the APA, 5 U.S.C. § 556(b). At issue in this case, I think, is the question of mandatory disqualification under § 5(c) not voluntary disqualification under § 7(a).

**4.** The term "factually related case" is nowhere defined in the statute. A generic meaning might include a case involving the same subject area, such as deportation, exclusion, adjustment of status, etc. I do not think this interpretation was intended by the draftsmen since its vast potential for disqualification would cripple the administration of the law. Moreover, the legislative history and statutory language of the APA, as was emphasized in *Wong Yang Sung v. McGrath*, 339 U.S. 33, 70 S.Ct. 445, 94 L.Ed. 616 (1950), do not envision a total separation of functions. *See generally* U.S. Senate Committee on the Judiciary, *Administrative Procedure Act: Legislative History* 24–25, 237, 263, 361–62 (1946). A more precise, and I think intended, meaning for this factual relationship would include cases deriving from "a common nucleus of operative fact," the same test used in the area of pendent jurisdiction. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218, 228 (1966). Some support for this definition can be found in *American Cyanamid Co. v. Federal Trade Commission*, 363 F.2d 757, 768 (6th Cir. 1966). *See generally Federal Trade Commission v. Cement Institute*, 333 U.S. 638, 68 S.Ct. 793, 92 L.Ed. 1010 (1948); Note, Prejudice and the Administrative Process, 59 Nw. U. L. Rev. 216, 231 (1964).

from APA coverage. Section 7(a) of the APA, 5 U.S.C. § 556(b), provides in part that:

> This subchapter does not supersede the conduct of specified classes of proceedings, in whole or in part, by or before boards or other employees specially provided for by or designated under statute. . . .[5]

Immigration inspectors who presided over deportation hearings were "specially provided for by or designated pursuant to" § 16 of the Immigration Act. Act of February 5, 1917, 39 Stat. 885. Moreover, § 5 of the APA applied only to cases of "adjudication required by statute" and there was no express requirement for any hearing or adjudication in the provision of the Immigration Act of 1917 authorizing deportation.[6] Act of February 5, 1917, 39 Stat. 887. *See, e. g., United States ex rel. Saclarides v. Shaughnessy*, 180 F.2d 687 (2d Cir. 1950); *Azzollini v. Watkins*, 172 F.2d 897 (2d Cir. 1949). *Contra, United States ex rel. Trinler v. Carusi*, 166 F.2d 457 (3d Cir.), *rev'd on other grounds*, 168 F.2d 1014 (3d Cir. 1948).

In *Wong Yang Sung v. McGrath*, 339 U.S. 33, 70 S.Ct. 445, 94 L.Ed. 616 (1950), however, the Supreme Court held that the APA governed deportation hearings because while not statutorily mandated they were constitutionally required. 339 U.S. at 50, 70 S.Ct. 445. Justice Jackson, writing for the majority of the Court, announced that "it is the plain duty of the courts, regardless of their views of the wisdom or policy of the Act [the APA], to construe this remedial legislation to eliminate, so far as its text permits, the practices it condemns." 339 U.S. at 45, 70 S.Ct. at 452, 94 L.Ed. at 626. Applying this broad policy to the issue of deportation hearings, he continued:

The Administrative Procedure Act did not go so far as to require a complete separation of investigating and prosecuting functions from adjudicating functions. But that the safeguards it did set up were intended to ameliorate the evils from the commingling of functions as exemplified here is beyond doubt. And this commingling, if objectionable anywhere, would seem to be particularly so in the deportation proceeding, where we frequently meet with a voteless class of litigants who not only lack the influence of citizens, but who are strangers to the laws and customs in which they find themselves involved and who often do not even understand the tongue in which they are accused. Nothing in the nature of the parties or proceedings suggests that we should strain to exempt deportation proceedings from reforms in administrative procedure applicable generally to federal agencies. 339 U.S. at 46, 70 S.Ct. at 452, 94 L.Ed. at 626.

Despite its potential for wider application in immigration proceedings, the *Wong Yang Sung* decision was strictly interpreted by lower federal courts to govern only deportation and not exclusion hearings. *See, e. g., United States ex rel. Frisch v. Miller*, 181 F.2d 360 (5th Cir. 1950). Congress, moreover, in a rider to the Supplementary Appropriations Act of 1951, 64 Stat. 1048, negated the effect of *Wong Yang Sung* by specifically exempting deportation and exclusion hearings from the provisions of Sections 5, 7 and 8 of the APA.[7] Thus, until passage of the INA in 1952 it was clear that the procedural requirements of the APA did not govern deportation and exclusion hearings. Whether or not the APA would apply to other immigration proceedings, however, was never determined.

---

5. Until its amendment during recodification in 1966, § 7(a) of the APA, 5 U.S.C. § 1006(a), read:

> Nothing in this act shall be deemed to supersede the conduct of specified classes of proceedings in whole or part by or before boards or other officers specially provided for by or designated pursuant to statute.

6. There is also no specific exemption for the INS in § 2(a)(1) of the APA, 5 U.S.C. § 551(1).

7. This provision was later codified in 8 U.S.C. § 155a.

While the INA explicitly repealed the Appropriations Act rider, 8 U.S.C. § 155a, it did not specifically incorporate the holding of *Wong Yang Sung* with respect to deportation hearings. Instead, Congress consciously adopted a special administrative procedure which mirrored in part analogous provisions of the APA. *See* H.Rep. No. 1365, 82d Cong. 2d Sess (1952), 2 U.S. Code Cong. & Admin. News, p. 1710. The Supreme Court in *Marcello v. Bonds, supra,* 349 U.S. at 306–10, 75 S.Ct. 757, compared §§ 242(b) and 101(b)(4) of the INA, 8 U.S.C. §§ 1252(b) and 1101(b)(4), with §§ 5, 6 and 7 of the APA, 5 U.S.C. §§ 554, 555 and 556, and concluded that Congress had modified and adapted the APA hearings provisions to the particular needs of the deportation process.[8] The Court held that the INA hearings provisions expressly superseded those of the APA despite a pointed dissent by Justice Black who, joined by Justice Frankfurter, thought the more demanding features of the APA should govern. 349 U.S. 315–19, 75 S.Ct. 757 (Black, J. dissenting).

But the Court in *Marcello v. Bonds* did not discuss the relationship between the APA and other immigration proceedings besides deportation hearings. What the Court did establish in that decision, however, was a method of analysis to employ in discovering the interrelationship between the two acts. A court must compare the INA with analogous provisions of the APA to determine if Congress meant to adapt the procedural safeguards of the APA to the particular needs of the INS. In cases of doubt, the court should refer to the legislative history of both acts for guidance. But the fundamental presumption underlying this analysis is that where Congress has not specifically deviated from the APA by either adaptations of its provisions within the INA itself or statements in the legislative history, the APA should govern. 349 U.S. at 310, 75 S.Ct. 757. This presumption is consistent with the language and policy of § 12 of the APA, 5 U.S.C. § 559, which states in relevant part that a subsequent statute like the INA "may not be held to supersede or modify this subchapter [which includes § 5(c)] . . . except to the extent that it does so expressly." *See, e. g., Rusk v. Cort,* 369 U.S. 367, 82 S.Ct. 787, 7 L.Ed.2d 809 (1962); *Marcello v. Bonds, supra,* 349 U.S. at 310, 75 S.Ct. 757; *Shaughnessy v. Pedreiro,* 349 U.S. 48, 75 S.Ct. 591, 99 L.Ed. 868 (1955).

## II

Careful scrutiny of the provisions of the INA discloses that the BIA is not mentioned anywhere in the 119 page Act. Despite vigorous attempts to provide for the creation by statute of the BIA, the INA left it to be established and governed only by regulations of the Attorney General pursuant to his authority under § 103(a), 8 U.S.C. § 1103(a). The Attorney General has established a Board composed of a chairman and four other members and has outlined its broad appellate jurisdiction. 8 C.F.R. § 3.1(a). It is clear from the scope[9] and

---

8. Section 242(b) of the INA, 8 U.S.C. § 1252(b), provides a more restrictive mandatory disqualification provision than its counterpart under § 5(c) of the APA. It provides in pertinent part that:

No special inquiry officer shall conduct a proceeding in any case under this section in which he shall have participated in investigative functions or in which he shall have participated (except as provided in this subsection) in prosecuting functions.

9. (b) *Appellate jurisdiction.* Appeals shall lie to the Board of Immigration Appeals from the following:

(1) Decisions of special inquiry officers in exclusion cases, as provided in Part 236 of this chapter.

(2) Decisions of special inquiry officers in deportation cases, as provided in Part 242 of this chapter, except that no appeal shall lie from an order of a special inquiry officer under § 244.1 of this chapter granting voluntary departure within a period of at least 30 days, if the sole ground of appeal is that a greater period of departure time should have been fixed.

(3) Decisions on applications for the exercise of the discretionary authority contained in section 212(c) of the act, as provided in Part 212 of this chapter.

(4) Decisions involving administrative fines and penalties, including mitigation thereof, as provided in Part 280 of this chapter.

operation of the Board's appellate jurisdiction that an appeal must be considered as a distinct proceeding in need of some procedural safeguards. The Board, for example, does not consider itself bound by the findings made by an immigration judge. A former chairman of the Board has stated that:

> Unlike appellate courts, on questions of fact the Board is not limited to a determination if there was substantial evidence upon which the finding of the Special Inquiry Officer was based. The Board has the power and authority to review the record and makes its own conclusions as to facts. . . . In a word, the Board may make a de novo review of the record and makes its considerations and findings irrespective of those made by the Special Inquiry Officer.
>
> Finucane, Procedure Before the Board of Immigration Appeals, 31 Int. Rel. 26 (Jan. 22, 1954).

*See, e. g., Noverola-Bolaina v. Immigration & Nat. Serv.*, 395 F.2d 131, 135–36 (9th Cir. 1968); *Matter of B———*, 7 I. & N. Dec. 1, 36 (1956). But the regulations governing the BIA contain no mandatory disqualification provision similar to § 5(c) of the APA or § 242(b) of the INA. Thus, if the majority position is adopted, the alien has no greater procedural protection at Board proceedings than the requirements of the due process clause even though he does have the safeguards afforded by § 242(b) of the INA during proceedings conducted by immigration judges. This anomaly is never discussed by the majority but is probably attributable to their assumption that greater procedural protections are afforded at hearings conducted by immigration judges only because Congress expressly granted them in § 242(b).

This assumption, however, conflicts with the reasoning of *Marcello v. Bonds* and the legislative history of the INA. The House adopted a proposal to give the BIA statutory status but this provision was eliminated in conference. *See* 98 Cong. Rec. 4401; H.R.Rep. No. 1365, 82d Cong., 2d Sess. 36 (1952); S.Rep. No. 1137, 82d Cong., 2d Sess. pt. 2 at 8. (Minority Rep. on S. 2550) (1952). The reason for the rejection of a statutory BIA, according to Congressional testimony, was to prevent an independent board set up within the Department of Justice from possessing the authority to set aside the decisions of the head of that department, the Attorney General. *See* 98 Cong. Rec. 5778–5781 (1952). Thus Congress made an accommodation with the portion of § 5(c) of the APA which prohibits an agency employee engaged in adjudication from being "responsible to or subject to the supervision or direction of any officer, employee or agent engaged in the performance of investigative or prosecuting functions for an agency." But this decision cannot be interpreted to mean that Congress intended that all proceedings before the Board be exempt from the APA. Indeed the evidence suggests a contrary view.

Senator McCarran, the senatorial sponsor of both the APA and the INA as well as the leader of the opposition to the statutory creation of the BIA, concluded that:

> Except in cases of proceedings under section 235(c), relating to security cases, *the*

---

(5) Decisions on petitions filed in accordance with section 204 of the act (except petitions to accord preference classifications under section 203(a)(3) or section 203(a)(6) of the act, or a petition on behalf of a child described in section 101(b)(1)(F) of the act), and decisions on requests for revalidation and decisions revoking the approval of such petitions, in accordance with section 205 of the act, as provided in Parts 204 and 205, respectively, of this chapter.

(6) Decisions on applications for the exercise of the discretionary authority contained in section 212(d)(3) of the act as provided in Part 212 of this chapter.

(7) Determinations relating to bond, parole, or detention of an alien as provided in Part 242 of this chapter.

(8) Decisions of special inquiry officers in rescission of adjustment of status cases, as provided in Part 246 of this chapter.

(c) *Jurisdiction by certification.* The Commissioner, or any other duly authorized officer of the Service, or the Board may in any case arising under paragraph (b) of this section require certification of such case to the Board.

*provisions of the Administrative Procedure Act are made applicable to all proceedings before the Board of Immigration Appeals,* thereby providing judicial review in exclusion cases. 98 Cong. Rec. 5778 (1952) (remarks by Senator McCarran) (emphasis added).

Senator McCarran's interpretation is supported by the language of the proposals for a statutory BIA themselves, which did not provide for any special procedural safeguards. *See* 98 Cong. Rec. 4401 (remarks of Representative Celler), 5778 (remarks of Senator Moody). Presumably no procedural safeguards were included in these statutory proposals because even these congressmen believed that the APA would govern review proceedings.

Thus, applying the same reasoning and analysis which Justice Clark employed in *Marcello v. Bonds,* I conclude that § 5(c) governs these review proceedings. The majority opinion rejects this conclusion for two reasons. First, the majority urges that leaving the initial hearing examiner exempt from the APA while requiring the Board to comply would be an anomalous result. There is no such anomaly, because Congress in the INA dealt specifically with the procedural safeguards applicable to the initial hearing, but did not deal with the nonstatutory Board of Appeals. Next the majority argues that the language of § 242(b) of the INA expressly stating that the procedure outlined for determining deportability "shall be the sole and exclusive procedure" should also apply to the Board. This argument, however, ignores the fact that no procedural safeguards have been outlined in the statute for the conduct of Board proceedings and the additional fact that the Board has been given a wider scope of jurisdiction than just review of deportation decisions. Moreover, as Justice Clark argued in *Marcello v. Bonds,* this provision of § 242(b) refers to Congress' intent to exempt initial deportation hearings from APA coverage. It does not address the question of what procedures should govern the review of those proceedings which the Attor-

ney General has directed the BIA to provide.

## III

The most important reasons for applying § 5(c) of the APA to these cases, of course, are not these basic rules of statutory interpretation but rather the policy and purpose of the APA which Justice Jackson first announced in the context of immigration proceedings in *Wong Yang Sung.* While the impact of the *Wong Yang Sung* holding upon deportation hearings has been substantially altered by later cases and the passage of the INA, its broad policy analysis is still applicable to other immigration proceedings.

Certainly the commingling of the functions of advocacy and adjudication at stake in these cases was one of the undesirable features of the administrative process which the APA was designed to remedy. *See* Rep. Atty. Gen. Comm. Ad. Proc. 56 (1941), S. Doc. No. 8, 77th Cong., 1st Sess. 56 (1941). Given Justice Jackson's direction to the courts "to construe this remedial legislation to eliminate, so far as its text permits, the practices it condemns",[10] we should not hesitate to extend the procedural safeguards of the APA to cases before the Board of Immigration Appeals. Moreover, just as Justice Jackson concluded in the case of deportation hearings, "nothing in the nature of the parties or proceedings suggests that we should strain to exempt . . . [these] proceedings from reforms in administrative procedure applicable generally to federal agencies." 339 U.S. at 46, 70 S.Ct. at 452, 94 L.Ed. at 626. Finally, since Board appeals are often intimately connected with a prior deportation hearing, the absence of procedural safeguards afforded to a petitioner at this stage of the deportation process is as "particularly" objectionable as the absence of such safeguards at the hearing itself. We are just as likely to meet a "voteless class of litigants who not only lack the influence of citizens, but who are strangers to the laws and customs in which they find themselves in-

---

**10.** *Wong Yang Sung v. McGrath,* supra, 339     U.S. at 45, 70 S.Ct. at 452, 94 L.Ed. at 626.

volved and who often do not even understand the tongue in which they are accused" [11] at the appellate stage, because of the broad right of review granted by the Attorney General's regulations, as we are at the initial hearing.

Even if the legislative history did not lead me to the conclusion that the mandatory disqualification provision of § 5(c) of the APA applies, these policy considerations would. The APA is precisely the type of remedial statute which provides courts with a broad congressional judgment regarding administrative policy to which they should refer in establishing rules of decision in this area, especially in cases of first impression. Even if not literally applicable, the statute is a significant precedent. Those familiar with the history of the interrelationship of the APA and INA will recognize immediately that there has been a continuous dialogue between the courts and Congress on such issues as now confront this court. *See, e. g.* Note, Deportation and Exclusion: A Continuing Dialogue Between Congress and the Courts, 71 Yale L.J. 760 (1962). With this in mind I believe we should hold that the APA applies and expect Congress to overrule us as if we have misinterpreted its original intention or erroneously anticipated its later judgment.

In summary, § 5(c) of the APA governs these appeals and requires us to remand it to the Board to determine if the members in question had participated or advised in a "factually related case." I am not at all concerned, as the majority appears to be, that "[t]o apply the APA in these cases would interject needless complexity into what is designed to be a discretionary process." Complexities are the very sinews of liberty, and simplification, in the sanctioning context, almost invariably the weapon of oppressors.

---

11. *Id.* at 46, 70 S.Ct. at 452, 94 L.Ed. at 626.